## UNITED STATES *v.* BARLOW.
## BARLOW *v.* UNITED STATES.

### APPEALS FROM THE COURT OF CLAIMS.

Nos. 127, 128.　Argued January 23, 1902.—Decided February 24, 1902.

Under the contract with the United States for the construction of a dry dock which is set forth and referred to in the statement of facts and in the opinion of the court, the decision of the engineer in charge of the work upon the quality of the sandstone employed by the constructor was final when properly exercised, but it could not be exercised in advance of the work, and forestall his judgment of stone furnished or about to be used, or the judgment of any other competent officer, or person, or persons who might be designated by the Navy Department.

The Court of Claims did not pass upon the issue raised as to the quality of the stone furnished, but accepted the decision of the engineer as final as matter of law.　This court limits the recovery of claimants to the price of stone inspected and approved.

There was nothing in the contract or in the specifications which required the contractors to experiment with the water jet system; their obligation was to drive the piles in the construction of the dock to a sufficient depth, and it is not found that the depth when the Secretary of the Navy interfered was not sufficient.

The measure of damages adopted by the Court of Claims was correct.

THESE are cross appeals.　The appellees in No. 127, appellants in No. 128, filed three separate petitions against the United States in the Court of Claims for extra work done and extra materials furnished under a contract with the United States. The petitions were consolidated and tried as one case.　On some of the claims the decision was in favor of petitioners and on others in favor of the United States.

The claimants entered into a contract with the United States for the construction of a dry dock at Puget Sound, in the State of Washington. The contract was in writing, and was very full.

There are only a few of its provisions in controversy, and those only need be quoted :

"First. The constructors will . . . construct and complete, ready to receive vessels, a dry dock, to be located at the place shown on a plan accompanying this contract, at the naval station, Puget Sound, Washington; and will, at their own risk and expense, furnish and provide all labor, materials, tools, implements and appliances of every description—all of which shall be of the best kind and quality adapted for the work as described in the specifications—necessary or requisite in and about the construction of said dry dock and the caisson, pumping machinery, pumphouse, culverts, and all other accessories and appurtenances, in accordance with the aforesaid plans and specifications, subject to the approval of the civil engineer, or such other competent officer or person or persons as may for that purpose be designated by the party of the second part; it being further mutually stipulated and agreed that the officer or officers, person or persons, thus designated shall and may, from time to time, during the progress of the work, inspect all material furnished and all work done under this contract, with full power to reject any material or work, in whole or in part, which he or they may deem unsuitable for the purpose or purposes intended, or not in strict conformity with spirit and intent of 'this contract and with the aforesaid plans and specifications, and to cause any inferior or unsafe work to be taken down, by and at the expense of the contractors; and that all such rejected material shall be at once removed from the station and replaced by material satisfactory to such inspector, and that all such inferior or unsafe work shall be replaced by satisfactory work, by and at the expense of the contractors. Such inspectors shall at all times during the progress of the work have full access thereto, and the contractors shall furnish them with full facilities for the inspection and superintendence of the same."

\*      \*      \*      \*      \*      \*      \*      \*

"Seventh. The construction of the said dry dock and its ac-

ce..ories and appurtenances herein contracted for shall conform in all respects to and with the plans and specifications aforesaid, which plans and specifications are hereto annexed, and shall be deemed and taken as forming a part of this contract, with the like operation and effect as if the same were incorporated herein. No omission in the plans or specifications of any detail, object or provision necessary to carry this contract into full and complete effect, in accordance with the true intent and meaning hereof, shall operate to the disadvantage of the United States, but the same shall be satisfactorily supplied, performed and observed by the contractors, and all claims for extra compensation by reason of, or for or on account of, such extra performance, are hereby, and in consideration of the premises, expressly waived; and it is hereby further provided, and this contract is upon the express condition, that the said plans and specifications shall not be changed in any respect, except upon the written order of the Bureau of Yards and Docks; and that if at any time it shall be found advantageous or necessary to make any change or modification in the aforesaid plans and specifications, such change or modification must be agreed upon in writing by the parties to the contract, the agreement to set forth fully the reasons for such change, and the nature thereof, and the increased or diminished compensation, based upon the estimated actual cost thereof which the contractors shall receive, if any : Provided, That whenever the said changes increase or decrease the cost by a sum exceeding five hundred dollars ($500) the actual cost thereof shall be determined by a board of naval officers appointed for the purpose, and the contractors shall be bound by the determination of said board, or a majority thereof, as to the amount of increased or diminished compensation they shall be entitled to receive in consequence of such change or changes : And provided also, That no further payment shall be made unless such supplemental or modified agreement shall have been signed before the obligation arising from such change or modification was incurred, and until after its approval by the party of the second part : And provided further, That no change herein provided for shall in any manner affect the validity of this contract.

"Eighth. The aforesaid dry dock and its accessories and the appurtenances and each and every part thereof, shall be constructed of approved materials and in a thoroughly substantial and workmanlike manner, in accordance with the true intent, meaning and spirit of the contract, plans and specifications, to the satisfaction of the party of the second part.

\*        \*        \*        \*        \*        \*        \*        \*

"Fourteenth. It is expressly understood, covenanted and agreed by and between the parties to the contract, that if any doubts or disputes as to the meaning or requirements of any thing in the contract, or if any discrepancy appear between the aforesaid plans and specifications and this contract, the matter shall be at once referred for the consideration and decision of the Chief of the Bureau of Yards and Docks, and his decision thereon shall be final, subject, however, to the right of the contractors to appeal from such decision to the Secretary of the Navy, who, in case of such appeal, shall be furnished by the contractors with a full and complete statement of the grounds of their appeal, in writing, and shall thereupon take such action in the premises as, in his judgment, the rights and interests of the respective parties to this contract shall require, and the parties of the first part hereby bind themselves and their heirs and assigns, and their personal and legal representatives, to abide by his, the said Secretary's, decision in the premises."

The specifications referred to in the contract contain the following provision :

"The ashlar must be of granite or sandstone, of quality approved by the engineer. All stones must be hard, clean and free from seams and imperfections, and of good bed and build. They must be laid true on their natural beds, and without pinning."

The largest item in the contentions of the parties arises on that provision of the specifications.

The court found that a bid based on the use of sandstone was accepted, and that shortly after the inception of the work the claimants tendered to U. S. G. White, civil engineer in charge of the work, a sample of the sandstone which was proposed to be used in the ashlar of the dock, and offered at the

same time to exhibit to him the quarry from which the stone was taken. Early in the spring of 1893 the engineer visited the quarry, satisfied himself by certain inspections (which are detailed in the findings) of the quality of the stone, observed its satisfactory use elsewhere, and made numerous examinations with a glass magnifying six or eight diameters, looking to the detection of any mica or other substances in its composition, and found none, the texture appearing uniform and good under the glass, and he subsequently made a test to determine the percentage of absorption. As a result of this examination he approved the sandstone from the Tenino quarry, and informed the claimants that the same would be accepted for all work under the contract.

On May 4, 1893, the claimants (appellees), relying on the assurance of the engineer, entered into a contract " with the owners of the quarry to furnish them from said quarry all of the sandstone required for the work." By the contract (which is set out in full in the findings) the Tenino Stone Quarry Company covenanted to furnish and deliver " all of the sandstone required for the stone entrance of the United States dry dock, Puget Sound, Washington, according to drawings and schedules of courses, numbers and sizes furnished by the parties of the second part, and which form a part of this contract, for the sum of forty (40) cents per cubic foot, and all of the stone for the boiler and pump house trimmings for the sum of fifty-five (55) cents per cubic foot." And it was covenanted " that the stone shall be Tenino bluestone of good, even, regular texture, of quality approved and acceptable to the civil engineer, United States Navy, in charge of construction." Also that " payments of 90 per cent to be made monthly for all stone delivered the previous month upon acceptance, approval and estimate of the civil engineer, United States Navy, in charge of construction, and as soon as payment is received therefor from the Government by the parties of the second part, and the remaining ten per cent upon completion of the setting of the stonework and upon the approval and acceptance of the stone by the said civil engineer, United States Navy."

Afterwards the claimants entered into a contract with Albert

and Lewis Beaudette, stonecutters, to cut the stone. Subsequently 2377 cubic feet of stone arrived at the site of the dock, which amounted to $1545.05 at 65 cents per foot, and was included in the vouchers rendered by claimants in the month of June, 1893, to which the following certificates, signed by the engineer officially, were annexed:

"Having fully examined the labor and materials above charged, I certify that they are of good quality and in all respects in conformity with the written contract of date October 29, 1892."

"Received the above labor and materials in good order at Puget Sound Naval Station this first day of July, 1893."

The amount rendered by the claimants, which included the said sum $1545.05, was approved by the Commandant, John C. Morong, July 8, 1893. The Navy Department struck out the item for $1545.05 on account of a communication from the Tacoma Trades Council of the State of Washington, complaining of the quality of the stone. A report on the quality of the stone was called for from the Commandant, and the latter in turn called for a report from the engineer in charge. The engineer reported favorably on the quality of the stone, and attached to his report letters from the chief engineer of the Northern Pacific Railroad and others. The Commandant accepted the report as his own, and forwarded it to the Navy Department.

June 14, 1893, the claimants addressed a letter to the Department describing the qualities of the stone, and stated that the protest against it was prompted by a "spirit of boycotting."

On the 21st of August, 1893, the claimants sent a letter to the engineer in charge, including their bill for the sandstone, and reciting the circumstances which led to its selection, and insisted "on immediate payment for said stone and the Bureau's decision as to the remaining stone."

On the 31st day of August, 1893, the Chief of the Bureau of Yards and Docks announced by letter to the Commandant of the Puget Sound Naval Station that the Tenino stone would not be accepted as material for construction, and on the 8th of September. 1893, the engineer in charge notified the claimants of this decision.

Upon being informed of this decision the claimants protested against the requirement, but offered stone from Sucia Island, and also from Dog Fish Point, which was accepted and used in the construction of the dock.

Upon their tendering such stone to the civil engineer in charge, he wrote them under date of March 29, 1894:

" MESSRS. BYRON BARLOW & CO.,
    " Charleston, Washington.
" Gentlemen : The receipt of your favor of yesterday is acknowledged, and in reply would say that the stones referred to therein, having been approved by the Bureau, will be accepted by me, subject to inspection under such specifications as I may be furnished with by the Bureau.

" 2. The specifications forming a part of your contract being of no effect under existing circumstances, I have asked for such specifications as will doubtless be furnished therewith before any stone will be delivered here.
        " Very respectfully,         U. S. G. WHITE,
" *Civil Engineer, U. S. Navy, in Charge of Construction.*"

Upon receiving the communication in regard to the quality of the Tenino stone the Navy Department, through the Bureau of Yards and Docks, instituted an examination into the qualities of the stone and its fitness, " with the result that said Navy Department, through the Chief of the Bureau of Yards and Docks, reached the conclusion that said Tenino sandstone was not fit and suitable for the purposes to which it was proposed to use said stone ; that said stone did not fulfil the requirements of the contract and specifications as above recited ; that it was not a hard stone, nor a clean stone, nor free from imperfections ; that its absorbent qualities were too high ; that its crushing strength was too low, and that it was in many essential particulars totally unfit and unsuitable and undesirable for the use in the ashlar of this dry dock ; and thereupon, to wit, on the 29th day of August, 1894, the contractors were notified of this decision of the Bureau of Yards and Docks, and were required to furnish other and better sandstone. From this decision of the Chief of the Bureau of Yards and Docks the

claimants appealed to the Secretary of the Navy, who concurred in the opinion of the said Chief of the Bureau of Yards and Docks, and concurred in his order requiring a different and better sandstone. The tests and analyses of said Tenino sandstone were made from samples furnished to the Bureau of Yards and Docks by the contractors and by the Commandant of the Puget Sound station. The delay in arriving at the ultimate determination to require a better quality of sandstone, which was reached on the 24th of August, 1894, was partly caused by the fact that the claimants were in correspondence with the Secretary of the Navy in an endeavor to persuade him to accept said Tenino sandstone. The tests and analyses of said stone, as above recited, were made promptly."

And it was found by the court:

" The amount of Tenino sandstone quarried, cut and delivered was 2349 cubic feet, amounting, at 65 cents a cubic foot, to $1526.85.

" The claimants had also, before receiving notice of the rejection of the Tenino sandstone by the Bureau of Yards and Docks, caused to be quarried and cut, but not transported, 7280 cubic feet, amounting, at 65 cents a foot, less the cost of transportation, 10½ cents a foot, 54½ cents a foot, to $3967.60, making a total for stone actually quarried and cut, and part of which was delivered, of $5494.45. That sum, however, has not been paid by the claimants to the owners of the said Tenino stone quarry, nor does it appear that any action or suit has ever been brought against the said claimants for said sum of money.

" The total amount expended by the claimants for furnishing, delivering and cutting the stone which actually went into the construction of said dry dock from Sucia Island and Dog Fish Point, as aforesaid, was $33,556.23.

" If they had been allowed to furnish Tenino stone they could have done so at a cost of $17,948.80. The additional cost, therefore, to the claimants of furnishing the stone which they did furnish, over and above what it would have cost them to furnish the Tenino stone, is the difference between the two sums last named, amounting to $15,607.43."

In the execution of the contract claimants made a mistake in

the cutting off of certain piling, which mistake could be corrected in two ways. One of the ways was accepted by the Navy Department and executed by the claimants as required, but claimants were also required to make some additions which "had no relation to the error which had been made in the original construction of the sheet piling, but would have been required irrespectively of any such error having been made. The additional cost to the contractors amounted to $59.30." Finding IX.

It was discovered during the progress of the work that the soil at the bottom of the dock was of a very tenacious and unyielding character, so as to be difficult of penetration for piles driven by the ordinary drop-hammer process, and was so reported by the contractors.

It was stated, on the 15th of February, 1894, that penetration was from 8 to 10 feet, and while the Bureau of Yards and Docks thought this might be satisfactory, yet the Bureau also thought that the piles should be driven, if possible, fifteen feet below the bottom of the excavation. There was no claim made by the contractors at that time that they could not reach a greater depth than theretofore reported. After some correspondence the Bureau telegraphed definite instructions to accept no piles driven to a less depth than fifteen feet. The contractors made no attempt to show that this could not be done, but employed experts to give an opinion, after tests upon the piles driven, that the Bureau was wrong. "In view of these facts, the Secretary of the Navy, on the 21st day of May, 1894, and upon the occasion of a visit to said dock by that official, verbally authorized and directed the contractors to sink the piles by a method known as the water-jet system; that is to say, by forcing water into the ground by means of a sink pipe operated by the hydraulic system, thus forming a hole into which the pile is set. The contractors objected to and protested against this method of driving the piles upon the ground that it destroyed and weakened the bottom of the pit, and subsequently a board of naval experts was convened for the purpose of reporting upon the advisability of sinking the piles by this system. The board reported adversely to this system, and recommended

that the piles be driven in accordance with the provisions of the contract and by the ordinary drop-hammer process, the piles to be driven to a minimum of 6 feet. The remaining 696 piles, which were driven after this report by the drop-hammer process, reached an average depth of 10 feet 4 inches."

The same board of naval experts, under the direction of the Secretary of the Navy, passed upon the expense caused the contractors by the use of the water-jet system, and recommended an allowance of $1156.76. The allowance was approved by the Secretary and a voucher drawn therefor; "but when the same came before the Auditor for the Navy Department for audit and before the Comptroller of the Treasury for payment, it was refused, upon the ground that the services required were not extra and additional, but that they were such as the contract contemplated, and upon the further ground that the Secretary of the Navy, under the specific requirements of section 7 of the original contract, had no power or authority to authorize or direct the incurring of this expense unless the cost of the same was first ascertained by a board of officers provided for that purpose before the expense was incurred, and reduced to writing, as required by the seventh clause of the contract. Whereupon the Secretary of the Navy procured the reference of this item to this court under and pursuant to the provisions of Revised Statutes, section 1063." Finding XI.

The reasonable value of the work set forth and described in the finding is $1156.76.

The foregoing statement of facts is applicable to the appeal of the United States. The findings applicable to the appeal of claimants (No. 128) are given in the opinion.

*Mr. George Hines Gorman* for the United States. *Mr. Assistant Attorney General Pradt* was on his brief.

*Mr. George A. King* for Barlow. *Mr. Rufus H. Thayer* was on his brief.

Mr. JUSTICE McKENNA, after stating the case as above, delivered the opinion of the court.

The principal claim of appellees and the largest item in the

judgment awarded them grows out of the rejection of the Tenino sandstone. That item was based upon the provision in the specifications which required it to be " of quality approved by the engineer." But that provision, it is contended by the United States, must be read and construed with those covenants of the contract which require (1) that all materials used in the dry dock shall be of the best kind, "subject to the approval of the civil engineer, or such other competent officer or person or persons as may for that purpose be designated by the party of the second part," which officer or persons may, " from time to time during the progress of the work, inspect all material furnished, . . . with full power to reject any material, in whole or in part, which he or they may deem unsuitable for the purpose or purposes intended, or not in strict conformity with the spirit and intention of this contract, and the aforesaid plan and specifications." And the United States also relies upon the covenants contained in the fourteenth subdivision of the contract set out in the statement of facts.

And we think these provisions are harmonious and determine the rights of the parties. We think, indeed, that the engineer in charge of the work was the appointee of the parties, and that his decision upon the quality of sandstone was final when properly exercised, but it could not be exercised in advance of the work and forestall his judgment of stone furnished or about to be used, or the judgment of any "other competent officer or person or persons" who might be designated by the Navy Department. To so hold would destroy the power reserved by the United States to appoint any competent person to inspect the work and material. The engineer was given power to judge, not a type of stone, but particular stones. It was such stones which were to be " hard, clean and free from seams and imperfections, and of good bed and build." Such was the power of the engineer in charge, but who should be the " engineer in charge" depended upon the appointment of the Navy Department; and the power of appointment was reserved to be exercised at any time. A useless right if one appointee could anticipate and control the judgment of his successor.

The influence which these considerations have in the inter-

pretation of the contract is not destroyed by answering that every stone from the Tenino quarry might have satisfied every requirement and have been approved by every and any person designated to inspect the work. This, indeed, might be so; but, on the other hand, not one stone might have passed the test. Besides, claimants are not in a position to urge that consideration. Every stone which might be tendered for inspection was subject to be rejected, but claimants seek to recover as for an acceptance. They rely not upon approval of stones, but upon the approval of the quarry, and they rest the quality of the quarry upon the general inspection of the engineer and certain instances of satisfactory use. In opposition stands the covenants of the contract already mentioned, and the test the Bureau of Yards and Docks made of samples of Tenino stone furnished by claimants. And there is no pretence that the test was unfairly made. It, at least, convinced the Bureau that the Tenino stone was not a hard stone, nor a clean stone, nor free from imperfections.

The Court of Claims did not pass upon the issue raised as to the quality of the stone. It accepted the decision of the engineer as being final as a matter of law. We cannot concur to the full extent of the decision, and must limit, therefore, the recovery of claimants to the price of stone inspected and approved. On this the finding is that " the amount of Tenino sandstone quarried, cut and delivered was 2349 cubic feet, amounting, at 65 cents a cubic foot, to $1526.85."

These views render it unnecessary to consider that provision of the contract which makes the decision of the Chief of the Bureau of Yards and Docks final, only subject to appeal to the Secretary of the Navy, of "any doubts or disputes as to the meaning or requirement of anything" in the contract.

2. The next item of importance is the expense to which the claimants were subjected in experimenting with the water-jet system. The court found that the experiment was ordered by the Secretary of the Navy against the protest of the claimants, and the board of inspectors found that the cost of the experiment to the claimants was $1156.76, and recommended the payment of that sum. This action was approved by the Secre-

tary, and vouchers drawn accordingly. It was refused when it came for audit and payment, because "under the specific requirements of section 7 of the original contract, [he] had no power or authority to authorize or direct the incurring of this expense unless the cost of the same was first ascertained by a board of officers provided for that purpose before the expense was incurred, and reduced to writing, as required by the seventh clause of the contract. Whereupon the Secretary of the Navy procured the reference of this item to this court under and pursuant to the provisions of Revised Statutes, section 1063."

There was certainly nothing in the contract or in the specifications which required the contractors to experiment with the water-jet system. There was nothing in the contract which required them to experiment with ineffectual or detrimental methods. Their obligation was to drive the piles in the construction of the dock to a sufficient depth, and it is not found that the depth attained, when the Secretary of the Navy interferred, was not sufficient. The Bureau of Yards and Docks conceived a greater depth to be necessary and that it could be attained. Some controversy arose, and there were reports to and correspondence with the Bureau of Yards and Docks, and finally the Bureau "telegraphed definite instructions " " to accept no piles driven to a less depth than 15 feet." In view of the facts the Secretary of the Navy, on the occasion of a visit to the dock, "verbally authorized and directed the contractors to sink the piles" by the water-jet system. The contractors protested and predicted failure. Failure occurred and the system was abandoned upon an adverse opinion of its utility given by a board of naval experts.

It is contended by the United States that the direction of the Secretary of the Navy was a change or modification of the contract within the meaning of the seventh subdivision of the contract, and that the Secretary had no power to direct or consent to such change more than the "humblest laborer employed upon the work," and besides, that no such change could be made except by an agreement in writing.

We have no doubt of the power of the Secretary of the Navy. His power is manifest from the contract and is given by law.

The duties of the bureaus of the Navy Department are performed under the control of the Secretary of the Navy. Their orders are considered as emanating from him and have "full force and effect as such." Section 420, Rev. Stat. And the act of 1891, which provided for the construction of the dry dock, authorized the Secretary of the Navy to have it constructed by contract. He especially stood for the United States in such contract, and was invested with its power, and was charged with the duty of seeing that the dock was adequately constructed.

It is further contended by the Government that the experiment with the water-jet system was a "change or modification" of the contract, and because not agreed to in writing by the parties that the expense incurred by the contractors in making the experiment cannot be recovered.

If both contracting parties were individuals, it would easily be seen that subdivision seven was inserted in the contract for their benefit, to be insisted upon or waived as to them might seem best. What precluded that freedom and useful power to the Government? If not precluded it certainly could have been exercised, and, as we have seen, through the Secretary of the Navy. If the power to insert the provision in the contract or to omit it was given, the power to dispense with it was also given, unless it was necessary to be inserted, and could not be dispensed with, on account of some injunction of the law. Such injunction, as we understand counsel, is claimed by virtue of section 3744 of the Revised Statutes, which requires the Secretary of the Navy to cause all contracts made by his Department to be reduced to writing and signed by the contracting parties with their names at the end thereof. It is certainly disputable if the requirement of the section applies to alterations, which may become necessary in the progress of work regularly conducted under contract. And this court has held that the requirements of the section did not preclude a recovery for property or services "as upon an implied contract for a *quantum meruit.*" *Clark* v. *United States,* 95 U. S. 539. But we are not required to decide on this record the question suggested. We do not think that the order of the Secretary of

the Navy directing the experiment with the water-jet system was a "change or modification" of the contract within the sense of subdivision seven. It was an exercise of superintendence and unwarrantable superintendence. The experiment was forced upon the contractors. They were powerless to do anything but protest and yield. The interference with the work of driving the piles by the drop-hammer process was an improper interference, and brings the claim of the contractors within the rule in *Clark's* case, 6 Wall. 546; *Smoot's* case, 15 Wall. 47; the case of the *Amoskeag Company*, and within the ruling of *United States* v. *Smith*, 94 U. S. 214, where the other cases are cited and approved. By denominating the order of the Secretary as an improper interference, we mean in a legal sense. The facts show that he considered the order as a proper exercise of his authority, and beneficial to the United States. Nor did he intend to be oppressive to the contractors. He subsequently recognized their right to reimbursement for the expenses which they had incurred.

The measure of damages adopted by the Court of Claims, we think, was correct. The expense caused to the claimants by the suspension of the regular work was as definite and as directly assignable to the action of the Secretary as the expenditure in the experiment.

There was no error in allowing the sum of $59.30 for the extra work set forth in Finding IX.

The summary of our views upon the appeal of the United States is that the Court of Claims erred in allowing the following claims:

Tenino stone quarried and not delivered.....$ 3,967 60
Difference in cost between Tenino stone and
    that which was furnished................ 15,607 43
                                       $19,575 03

The appeal of the claimants is based on the action of the Court of Claims in denying recovery for the extra work and materials described in Findings VIII and X.

Those findings are as follows:

" VIII. The plans for the foundations of the boilers and boiler house were submitted to the civil engineer in charge of the work and approved by him, and the work was then done on said foundations in accordance with the directions of said engineer. The foundations for the boiler house were completed and accepted by said engineer and included in his monthly estimate and paid for. The foundations for the boilers were made in accordance with the drawings so submitted to said engineer, and were completely laid at about the time the engineer first in charge of said work was detached therefrom. Subsequently another engineer was placed in charge of the work. In his opinion the foundations were imperfect and insecure because of defective construction on the part of the claimants, and he required that they be relaid. The claimants, protesting that it was not competent to require them to change the foundations after they had laid the same to the acceptance of the engineer in charge at the time of the original construction, relaid the same in accordance with the direction of the engineer thus subsequently in charge. The matter was subsequently referred to the Chief of the Bureau of Yards and Docks, and he decided that the work was required to be done by the terms of the contract. It does not appear that the claimants appealed to the Chief of the Bureau before doing the work, or that it was ordered by him.

"The total additional cost of said work to the claimants was—

For the extra foundations for the boiler house... $312 12
And for the extra foundations for the boilers.... 384 56
Making a total of..................... $696 68 "

" X. In refilling the dirt after the altars were in place no part of the filling was rammed or sluiced except the clay puddling. This was in accordance with the instructions of the engineer in charge of the work. The claimants discussed the matter with him, and he informed them that it was not required to be rammed or sluiced. He embraced the work done in that way in his monthly estimates, and the claimants received payment for a large portion of the work done in that way at

the contract rate of ' Filling and grading per cubic yard, 30 cents.' In the latter part of August, 1894, however, there was a change in the office of engineer in charge of the work for the United States. The new engineer then placed in charge required the claimants to ram or sluice all back fillings. The claimants protested, insisting that the contract did not require anything more than depositing the material and evenly grading the surface to correspond with the grade of the station. The new engineer, however, required all the work to be thoroughly sluiced with water, and all but a small part thoroughly rammed, and the claimants did the work in that way under protest.

" The additional cost to the claimants of doing this work, over and above what would have been required had they not been required to ram or sluice the same, would be ten cents a yard, making, for 37,227 yards, $3722.70. The engineer who ordered the work done in the manner stated referred the question of so requiring it, at the request of the claimants, to the Chief of the Bureau of Yards and Docks, and the latter informed said engineer that the Department approved his requirement, for the reason, as shown by the Bureau, that the contract plainly required it."

The claims were rightly disallowed. Some of the observations already made apply to them. The contract is very explicit in that all labor and materials " shall be of the best kind and quality adapted for the work," and subject not only to the approval of the civil engineer at a particular time, but subject to the approval of any engineer subsequently appointed, " with full power to reject any material or work, in whole or in part, which he or they (some other competent officer, or person or persons) may deem unsuitable for the purpose or purposes intended. . . . And to cause any inferior or unsafe work to be taken down by, and at the expense of the contractors, . . . . and replaced by material satisfactory to such inspector . . . . by and at the expense of the contractors."

In addition to these views we quote from the opinion of the Court of Claims as follows :

" As to the causes of action set forth in Findings VIII and X, the court is of the opinion that the claimants should have

submitted the requirements of the engineer in charge to the Chief of the Bureau before proceeding with the work. They were required to do so by the terms of the contract, and authority to compel them to do additional work was thereby reserved to the Chief of the Bureau."

Judgment is reduced to the sum of $5367.96, and for that amount

*Affirmed.*

Mr. Justice Brewer and Mr. Justice Peckham dissented.

Mr. Justice Harlan did not hear the argument, and took no part in the decision.