Booth, Judge,
delivered the opinion of the court:
On June 15, 1918, the plaintiff company entered into a written agreement with the defendant to supply the necessary services for handling coal during the fiscal year 1919. The coal and the mechanical means for disposing of the same were to be furnished by the Government, the plaintiff being required to furnish the requisite supply of labor and coal such naval transports at the port of New York as the Navy directed. The contract, which is made a part of the petition, contained this clause:
“(J) Whenever it is definitely shown that the work is not progressing satisfactorily the Navy reserves the right to take charge of the work for the contractor’s account, contractor being liable to the Navy for all payments that may have been received and all cost for the completion of the contract in excess of the cost provided for herein'; in no event, however, shall the contractor be liable for any failure to perform or fulfill, or any delay in performing or fulfilling any of its obligations hereunder or covenants herein contained caused directly or indirectly by any. order, act, or omission of the Government.”
The plaintiff company was especially familiar with the character of work it engaged to perform, knew well the inherent difficulties attending its performance, and from long experience was far better equipped to contend against adverse conditions than any other agency connected with the contract or service involved. The coaling of naval transports, expeditiously and within precise limits of time, was work not only of great magnitude but of supreme and critical importance during the war. The actual manual labor involved imposed the employment of large numbers of stevedores and the supply of this class of labor was limited almost exclusively to Italians, many of whom were un *867 able to speak or comprehend the English language, and had fixed and rigid notions as to .hours of labor and weather conditions under which it should be performed. The plaintiff company was perfectly aware of the difficulties emanating or liable to emanate from this source, and demonstrated its ability to meet emergencies by fulfilling its contractual obligations to the very letter until midnight of August 22, 1918. The officers of the defendant, charged with the responsibility of having the transports properly coaled and ready for service at the precise time designated, were from the outset acutely disturbed over labor conditions, and seem to' have constantly entertained the fear that momentarily the stevedores would desert the plaintiff and leave the company helpless to perform its contract. No such state of affairs ever did obtain, but the defendant’s officers, in their zeal and anxiety, at a critical juncture in war time, in charge of work of overwhelming importance, balanced the consequences against the possibility of the event and acted accordingly. This record indisputably sustains this assertion, for on August 21, 1918, the plaintiff company was engaged in coaling the transports Agamemnon and Mount Vernon, which service was to be completed by August 25, 1918. On August 22, the day following the direction to coal the vessels, the assistant to aid for supply, Commander George W. Pigman, in a written communication to the plaintiff company, acting under orders from the “Commander, cruiser force,” took over -the work the plaintiff had agreed to perform, refused, after protest lodged by the plaintiff company, to allow it to proceed, and thereafter coaled the Navy transports at the cost and expense of the defendant. A written stipulation in the record concedes that the plaintiff company, up to Aizgust 22,1918, had earned under its contract and was entitled to be paid $62,154.07, and for this amount this suit is brought.
The defendant interposes a counterclaim. The amounts are not in dispute. The Government expended $88,895.15 more than it would have had to expend if the plaintiff had completed its contract according to its provisions, thus leaving a balance of $26,741.08, for which amount the defendant demands judgment. The decision turns upon the construe *868 tion and legal effect of clause “(j)” of the contract. The stipulation as to amount due the plaintiff company manifestly admits that the plaintiff had faithfully fulfilled its contract to this extent at least.
Clause “(j)” when considered in conjunction with clause “(m)” indicates clearly the establishment of an authority to determine the contract when the conditions enumerated obtain. Clauses of similar import have been so frequently before this and the Supreme Court that it i.s wholly unnecessary to multiply citations respecting their legal effect. In this instance it is sufficient to observe that where parties by mutual agreement stipulate the conditions upon which contractual obligations may be terminated, who may act and pass judgment upon the cause for termination, and the consequences which follow, the acts and conduct of one .so empowered may not be challenged, except for bad faith, or such gross error as would warrant the court in implying bad faith. United States v. Gleason, 175 U. S. 588; Yale & Towne Mfg. Co. v. United States, 58 C. Cls. 633. Obviously the burden of bringing the' case within the rule rests upon the plaintiff. As a matter of record, the plaintiff company has fully recognized the burden and proceeded accordingly. A contractual right of forfeiture, involving substantial damages and consequences, is generally closely scrutinized-by the courts, and where the plaintiff presents a record disclosing an unwarranted exercise of the same, contrary to the plain intent of the parties to the agreement, it will not be sustained. Clause “(j)” standing alone does not confer on any specific individual the right to invoke its provision; resort to other provision.s of the contract confer that authority. Therefore, clause “(j),” by its express terms, erects a specific condition, calls forth the existence of a state of facts, before it becomes available for the purpose of termination. It must be “ definitely shown that the. work is not progressing satisfactorily” before the plaintiff company may be called upon to lose all they have earned and respond in damages for a much larger sum. Hence, if the plaintiff, by a preponderance of testimony, in fact, uncontradicted testimony, establishes as a fact that its contract was in fact and in truth terminated for a reason other than one mentioned in clause *869 “(j),” and wholly foreign to the one contemplated by the parties when the contract was executed, the error in so acting is sufficiently gross to warrant the court in implying bad faith. This is assuming, without deciding, that the officer who terminated the contract had authority under clause “(j)” thereof.
We have heretofore adverted to the defendant’s continuous and sustained anxiety over labor conditions. This ever-present menace, in the defendant’s view of the situation, finally impelled the officers in charge to resort to the war power of the Nation, at least to impress upon the stevedores that they were part of the Navy, and they were given badgvs to wear and advised that they were in the war service of the Government. The' labor organization in New York, of which they were largely members, was appealed to for aid, and assistants were dispatched to the scene to help in maintaining loyalty to the contract work. This was all done not because the plaintiff company had defaulted in the performance of its contract, or was on the point of defaulting, but as a war necessity, in the interest of the safety of the future, and to relieve from a possible contingency.
Surely it may not be contended in the face of this record that the contractor had failed in his undertaking or that in view of what had been done and what was being done it was definitely shown that the work was not progressing satisfactorily. It was progressing satisfactorily. There was no strike. The plaintiff company had very little trouble with. Italian labor. The work of coaling the two vessels mentioned was, to say the least, up to if not a little ahead of schedule. The anxiety and overzealousness of defendant’s officers, while commendable under the circumstances, was imaginary and not real.
The plaintiff is entitled under the rule in Ripley v. United States, 223 U. S. 695; United States v. Barlow, 184 U. S. 123; and Brinck, Receiver, v. United States, 53 C. Cls. 170, to a judgment for $62,154.07. Defendant’s counterclaim is dismissed. It is so ordered.
Hay, Judge; DowNey, Judge; and Campbell, Chief Justice, concur.
GRAham, Judge, took no part in the decision of this case.