Booth, Judge,
delivered the opinion of the court:
A few months after the signing of the armistice the Government had on hand over 200,000,000 pounds of Army bacon. Some j>ortion of this enormous supply was what is known in the trade as five-year pack, and the remainder as two-year pack, indicating the time limit for safe consumption. Confronted thus with the problem of disposing of a vast quantity of surplus bacon, and desiring to save the Government harmless to the greatest possible extent, the Surplus Property Division of the War Department, in pursuance of law, on May 10, 1919, advertised for bids to purchase 2,493,386 pounds of this bacon. The advertisement *970 specified the terms and conditions of the sale and fixed a minimum price of 22% cents per pound. There was no favorable response to the advertisement, and the proposed sale thereunder failed. Subsequently, the plaintiff, who was not a bidder theretofore, entered into negotiations with the.officers in charge, and on June 10, 1919, purchased for 28% cents per pound the 2,493,386 pounds of bacon previously advertised for sale. He met the obligations of his contract to the letter. The plaintiff began immediately a campaign to resell the purchased bacon. A short time subsequent to the sale he sold 211,116 pounds of the same, and to one of his customers had given an option to purchase 500,000 pounds more. This particular customer, on a visit to the warehouse in Baltimore to inspect the bacon upon which he had an option of purchase and with whom the plaintiff was then in a course of direct dealing, was knowingly and intentionally tolled away from his connections with the plaintiff by officers of the Government, who offered him bacon at a less price, succeeding in selling to him from time to time 800,000 pounds, more or less, of bacon, thereby precluding the plaintiff from disposing of the 500,000 pounds the prospective purchaser had gone to inspect. In the ordinary marts of trade acute competition might possibly characterize this transaction as within the zone of fairness. On the part of the Government, the legitimate custodian of property it had sold to the plaintiff, and knowing the purpose and intent of the plaintiff in making this large purchase, the transaction is impressive as one which might with great propriety have been omitted. The plaintiff at this very moment was assiduously engaged in seeking a market for his bacon, both at home and abroad. The hazardousness of his undertaking was manifest; the bacon purchased was' of the two-year-pack variety. The Government was selling bacon in large quantities. The surplus supply was sufficient to demoralize the market, and every contemporaneous incident was direct notification to the plaintiff to expeditiously dispose of his purchase or lose his profits.
On October 10, 1919, four months to the day after his purchase in good faith of this very substantial quantity of food supply, the plaintiff, without warning or previous no *971 tice of any character whatever, was indicted, by a Federal grand jury for the eastern district of New York for an alleged violation of the Lever Act, the act of August 10, 1917, 40 Stat. 276. The plaintiff was arrested, arraigned, and compelled to give bond upon a charge of hoarding the very bacon the Government had sold him, and for which the Government had received payment. This indictment was dismissed on demurrer January 10, 1920. In the meantime, however, the astute district attorney had procured another indictment of the plaintiff in the same court and for precisely the same cause on November 7, 1919. The second attempt met the same fate as its predecessor on March 24, 1920. Not content with these two abortive attempts at criminal prosecution, and displaying a persistence of extremely doubtful propriety, the plaintiff was for the third time indicted under the same statute on December 10, 1919, and thereafter, on February 28, 1920, this indictment was dismissed on motion of the Government. Three indictments had been returned against the plaintiff, and in each instance the prosecution of the plaintiff had ignominiously failed. Two decisions of a Federal court that under the statute a case had not been made out, and a voluntary dismissal as to the third, would in the usual course of criminal procedure be of itself sufficient to convince an ordinary prosecutor that his resources had been exhausted. Not so in this instance, however, 'for the plaintiff finally went to trial on a fourth indictment returned on February 4, 1920, and was promptly acquitted by a jury on February 16, 1920. It is true that under the special jurisdictional act we may not award the plaintiff damages resulting from the criminal proceedings. We set the facts forth in the findings and comment upon them because they form the fundamental basis and the alleged justification for the supplementary proceedings which resulted so disastrously to the plaintiff in this case. Contemporaneously wfith the criminal prosecution of the plaintiff the Government under section 7 of the Lever Act in the same Federal court libeled the plaintiff’s bacon then in warehouses in Brooklyn, N. Y., and by process of law absolutely forestalled the possibility of his selling a single pound of the same from October 27, 1919, until 29th day of March, *972 1920, when the same was formally released, the libel having-been voluntarily dismissed on March 1, 1920.
During this period of suspense the plaintiff endeavored in good faith to procure a stipulation from the Government authorizing the sale of the bacon and impounding the proceeds to await the decision of the court. Obviously this was of prime necessity to the plaintiff, for the bacon market was declining rapidly and his supply deteriorating in quality. The attempt failed because of the obstinacy of the district attorney. The Lever Act was a war emergency measure. It has been before the Supreme Court and we need not indulge in a discussion of the decisions. What the legislation intended to and did accomplish is a matter of public notoriety. By what process of reasoning it was applied to the sale, under a statute passed subsequent to the close of hostilities by the Government to a citizen of over two million pounds of surplus food supply, is most difficult to conjecture. In this instance we are confronted with an anomalous situation. The Government lawfully sells to a purchaser a sufficient quantity of supplies to make him a hoarder under the Lever Act, accepts his payments for the purchase, and then proceeds to prosecute him for the violation of a law to which its own conduct makes it a contributor, and, what is of more significance, is the admitted fact that the Government was engaged in doing the precise thing the plaintiff was doing. The Government was holding' at minimum prices a huge supply of bacon, refusing bids at a less figure, exerting every resource and resorting to every known business principle to prevent the decline of the market value of bacon, so that in the end the possibility of a great loss might not befall the United States. Manifestly the conduct of the affairs of the defendant was as clearly within the letter of the Lever Act as any conduct of the plaintiff appearing from the record herein. As said in the defendant’s brief: “As a general proposition, when the Government or individual sells or contracts to sell property to another, it is wrong for the seller to interfere with the buyer’s right to fully use or dispose of such property.”
It i,s true the defendant’s counsel labors diligently to escape the consequences of this statement, seeking to avert *973 its application by a general assertion that the rule of law extends no “unbridled license to use it in a manner which becomes a nuisance to the seller or otherwise injures him. * * * If the buyer uses it in an unlawful way or in a way deemed to be unlawful or to the injury of the .seller, the buyer may be prosecuted civilly or criminally.” In view of the stipulated findings and the unimpeachable record in this case recourse to this defense, granting arguendo its ai’ailability, is nothing short of startling. The entire criminal and civil resources of the Government were exerted to the limit in an effort to fasten some measure of guilt or misconduct upon this plaintiff, and the effort signally failed. The head of the very department which instituted all proceedings against the plaintiff, in an opinion which it will tax the ingenuity of defendant’s counsel to combat, admitted the error of plaintiff’s prosecution, and in effect attests the fact of the utter lack of probabb cause to do what was done. The defendant’s argument reduced to a finality erects a contention to the effect that this plaintiff was culpable, within the reach of both the criminal and civil provisions of the Lever Act, because he did not sell over two million pounds of bacon within four months after its purchase. A sufficient answer appears in the findings. The Government itself within this limit of dime deprived him of one customer for 500,000 pounds, and, as previously observed, was his most formidable competitor. We have gone over the record in this case with infinite care and have .searched in vain for even a slight pretext upon the part of the Government for first selling the plaintiff a large supply of perishable food supplies and then unjustly intervening to prevent the disposition of the same for a period of time sufficient to render the purchase practically valueless.
The war, as to all practical purposes, was over. Surplus Supplies of every kind and character, in vast quantities and amounts, were being disposed of by the various departments of the Government to citizens, firms, and corporations. There is scarcely a single instance imaginable (at least our docket attests the fact) where the very identical procedure might not have been adopted in every case of sale of surplus supplies. No one would be quite so stupid as to im *974 agine the plaintiff was buying the bacon he did buy for his own consumption, or conclude for a moment that the purchase of the plaintiff, large as it may seem, was of sufficient proportions to corner the bacon market. The littb over two million pounds held by the plaintiff was comparatively insignificant, when, as this court and the public well know, the Government was the plaintiff’s most formidable competitor, engaged in selling millions of pounds of tlm very same commodity at the same time. Of course he entered upon the enterprise as a business venture, a speculation, a legitimate attempt to make money. The Government knew this, and it would indeed present a situation not often encountered if the law would sanction the sale of Government property, lawfully conducted, and then allow the seller to seize the very property sold and forestall the purchaser from reaping the benefit of his contract. The transaction was foreign to either the letter or spirit of the Lever Act. In Voves v. United States, 249 Fed. 191, the court said:
“ Is our Government of the superhuman type that releases the ruler from the obligations of honesty and fairness that are imposed upon the citizens ? ”
However, we need not extend the discussion of this phase of the case. The facts clearly show that the contract of sale was rescinded by the Secretary of War following a very exhaustive and elucidating opinion of the Attorney General, advising the Secretary of his right under the law to do so. Therefore, under both the general and elementary principles of contractual rights, as well as what was done in this particular instance, the plaintiff is entitled to recover. The defendant must not overlook the fact that the special act confers jurisdiction to determine liability “that prevails between private parties.”
The plaintiff’s attorney in his brief sets forth a section of the uniform sales act which concisely states the law applicable to a sale of goods by private individuals. We repeat it:
“An implied warranty that the buyer shall have and enjoy quiet possession of the goods as against any lawful claim.s existing at the time of the sale.”
*975 A defense predicated upon the cases of Wilson v. United States, 11 C. Cls. 513; Deming's case, 1 C. Cls. 190; or Jones and Brown's ease, 1 C. Cls. 383, is not available here. Wh.at the Attorney General said in his opinion is apropos, notwithstanding it preceded the enactment of the jurisdictional statute:
“The Government being under definite contractual obligations to Leavitt, placed itself in the anomalous position of taking his money with one hand while with the other it actively and effectively prevented him from enjoying the fruits of his bargain. Such action, if attempted by an individual, could not receive judicial sanction, and for the Government to do it without making amends because it has the power is not compatible with sovereign honor or that measure of justice which the Government expects and exacts from its citizens. Clearly this, in effect, would constitute a failure of consideration moving from the Government for the money it received and retains. In itself such action would be in legal effect a rescission of the contract. The principles governing the relations of individuals in respect to their contracts are equally applicable where the United States is a party. The following cases are examples: United States v. Smith, 94 U. S. 214; United States v. Mueller, 113 U. S. 153; United States v. Barlow, 184 U. S. 123; Purcell Envelope Co. v. United States, 47 C. Cls. 1.”
A case in point is Deatz v. United States, 38 C. Cls. 355.
Following the dismissal of the libel proceedings the plaintiff, acting under the advice and in conjunction with the War Department, made repeated efforts to sell the bacon involved. In each instance failure attended the effort, because the bacon had so deteriorated in quality as to be unfit for consumption. The plaintiff conferred with the Department of Justice later on respecting his claim for losses, and asking the aid of the department in a suit against the Government. The department referred the plaintiff to the War Department; and, finally, after some delay in reaching the proper tribunal of the War Department, a hearing on his claim for a rescission of the contract and payment of damages was hacl before the Contracts and Advisory Branch of the Quartermaster General’s Office, evidence was taken, and a report favoring the rescission of the contract and allowing the claim was duly filed. This record, together with the *976 .report, finally reached the Secretary of War, and after a careful investigation by the Secretary the same ivas referred to the Attorney General, requesting the opinion of the chic I law officer of the Government as to the Secretary’s lawful right to rescind the contract and make the plaintiff whole. The Attorney General (33 Opinions, 69) advised the Secretary that it was within his power and authority to rescind the contract and "adjust the plaintiff’s losses. The Secretary of War, on the receipt of the opinion of the Attorney General, caused a hearing to be held by the Acting Judge Advocate General of the Artny to ascertain the extent of plaintiff’s loss. During the pendency of this hearing the Secretary of War asked the Comptroller of the Treasury if any appropriation was available out of which he might pay the plaintiff’s losses. The comptroller advised him that there was not; whereupon the Secretary of War wrote the plaintiff the letter set out in Finding XIV. As the final act, the bacon was sold under the supervision of the Quartermaster General of the Army for $53,564.84, being only its market value for rendering and not food purposes. The Secretary of War, finding himself unable to pay the plaintiff’s claim because of lack of available funds, filed the claim with the Bureau of the Budget, along with the opinion of the Attorney General, and including his own favorable findings. The Director of the Budget transmitted to the President his recommendation of an appropriation for payment in the sum of $620,623.33. The President approved the recommendation and transmitted his approval to Congress. Congress did not make the appropriation, sending the claim to this court for adjudication instead.
The Government has in its possession over six hundred thousand dollars of the plaintiff’s money, and has held it since 1920, for which he has received in exchange a small sum in excess of two hundred thousand dollars. We have heretofore alluded to the fact that plaintiff met his contractual obligations to the latter. Not only this, but while his bacon was impounded, in the possession of the United States marshal, the officers of the War Department shipped to the Brooklyn warehouse 424,930 pounds of bacon sold the plaintiff, and this identical bacon was subsequently *977 treated by the Government as part of the bacon libeled in the first instance, and for which the plaintiff paid, a most remarkable event in view of the status quo. Under the stipulated findings the failure of consideration is so marked and emphatic we need no more than refer thereto. It is decidedly unique to find the Department of Justice challenging as a defense to this case the accuracy of the opinion of the Attorney General. Without denying the right, it may not escape attention that ordinarily the legal opinion of the highest law officer of the Department of Justice, given in pursuance of his duties, especially when fortified by favorable approval from all to which the claim found its way, is accorded the distinction of finality in so far as the department itself is concerned. Suffice it to say that, in so far as here involved, the court find it unnecessary to review the same from the standpoint of accuracy and soundness. We are quite willing to adopt it.
The plaintiff is entitled to recover the following amounts, viz:
Paid by plaintiff to Government for bacon_.$01)8,404. 56
Insurance on bacon while in storage_ 37,450. 46
Storage, transportation, and protection_ 58, 954. 77
Attorney fee in defense of libel suit-.,_ 2, 500. 00
Judgment against plaintiff in suit for commission_ 422. 06
Attorney fee in connection with said suit_ 250. 00
Agent’s expenses in Europe and United States_ 2, 825. 00
Brokers’ expenses in negotiating foreign sales_ 5. 203. 07
Plaintiffs’ expenses in negotiating foreign sales_ 7,848. 20
Additional storage_ 175. 00
Cables, stamps, and sundries_ 2, 500. 00
Advertising- 582. 35
Auditing- 500. 00
Bookkeeper and officeman salaries_ 4,' 160. 00
821, 775. 47
As against the above items, the defendant is entitled to the following credits:
Salvage of bacon-$53, 554. 84
Returned by defendant for bacon, withheld_ 100, 245.11
Purchase value of bacon sold by plaintiff_ 60, 431. 95
214. 231. 90
Leaving a balance due the plaintiff of $607,543.57. See in this connection United States v. Spearin, 248 U. S. 132; United States v. Behan, 110 U. S. 338; United States v. *978 Peck, 102 U. S. 64; Houser v. United States, 39 C. Cls. 508; Clark v. Morgan Co. National Bank, 196 Fed. 709.
Judgment in favor of plaintiff for $607,543.57. It is so ordered.
Hay, Judge; DowNey, Judge; and Campbell, Chief Justice, concur.
GRAham, Judge, did not'bear and took no part in the decision of this case,