Hay, Judge,
delivered the opinion of the court:
The essential facts in this case are that in May, 1919, the United States had at the Army base, Norfolk, Va., about 1,500,000 pounds of hams which had been shipped to that base for storage during the months of January and February of 1919. These hams were packed in wooden boxes about 2 feet in length and 12 to 14 inches in height, and before being placed in the boxes were wrapped in paper and burlap. These boxes weighed about 100 pounds each and were stored in long, one-storied brick buildings. They were packed in stacks to the height of 10 or 12 feet, with passageways between the stacks. The buildings in *460 which these hams were stored were ventilated but not refrigerated, and were exposed to the direct rays of the sun and were built on low-lying land near to water.
On May 15, 1919, the inspector of the- Government advised the executive officer at the Army base, Norfolk, Va., that he had made a sample inspection of the aforesaid hams and had found the same to be sweet, but that due to atmospheric conditions at that station quite a number of the hams were covered with mold, and that the mold would grow very rapidly and in a short time penetrate the seams of the ham, and that if disposed of immediately they might be cleaned by wiping with a cloth. The inspector further stated that no movement to float this product had been had, and that most of this stock had been on hand over four months, and recommended that immediate steps be taken to dispose of the hams. On May 18, 1919, the United States sent two inspectors to the warehouse, and on that day they made an inspection of said hams and reported to the War Department that the sugar-cured hams were at that time sweet and sound, but that the surfaces were affected by an extensive growth of molds of various kinds. They stated it was their opinion that if the hams were reconditioned at once there would be no loss by trimming, as the mold in its present condition could be removed by the hams being thoroughly washed and cleaned. They further recommended that the sugar-cured hams packed in boxes be forwarded at once to packing plants, for reconditioning, and after the reconditioning that the hams should be disposed of as surplus property.
On May 21, 1919, the Surplus Property Division of the War Department sent out a circular telegram to the surplus property officers at different cities directing them to invite bids for 24 carloads of hams then in storage at the Army base, Norfolk, Va. This telegram is set out in full in Finding I, and among other, things contains the following: “Report of inspector states hams are at present sweet and sound but surfaces are affected by mold and that if reconditioned at once would be no loss from trimming, as mold in its present condition can be removed by thoroughly washing and cleaning.”
*461 This telegram was followed by a circular letter dated May 22, 1919, which is set out in full in Finding II, and which letter repeats in the same words the condition in which the hams were, as was stated in the circular telegram. In both the telegram and letter there is no limitation in the statement of the Government as to the condition of the hams; bidders are not invited to inspect the hams before buying, and no requirement is made that purchasers must take the hams “ as is.”
In response to the circulars 15 bids were submitted, which were all rejected. Bidders were, then by telegram dated May 26, 1919, invited to submit their highest bid in 48 hours. The plaintiff on May 27, 1919, submitted its bid for the entire quantity of hams at 20 cents a pound. On May 31, 1919, the plaintiff was verbally notified that its bid had been accepted, and June 2, 1919, a written notification of the acceptance was sent to the plaintiff, which was received by it on June 4, 1919. This acceptance is set out in full in Finding V. The circulars are made a part of the contract.
On June 11, 1919, the plaintiff went to the Army base where the hams were stored and was informed that no orders had been received for the release of the hams for shipment. On June 13 orders allowing the hams to be released were received. The weight of the hams was rechecked and the parties agreed on 1,403,374 as the number of pounds. Shipments from the base to Norfolk and Bichmond were made from June 14 to July 3, 1919, and on the same day on which each shipment of hams arrived at Norfolk or Bichmond they were placed in cold storage. The effect of cold storage to which these hams were subjected after their delivery to the plaintiff was to maintain them in the same condition in which they were at the time they were placed in .cold storage.
On August 9,1919, the hams which were in cold storage in Bichmond, Va., were seized by the State of Virginia as not being fit for sale for human consumption. The plaintiff applied to the United States Department of Agriculture for leave to ship immediately six carloads of hams and one car per day thereafter until the entire quantity of hams was shipped from the place of storage to the Sullivan Packing *462 Co. of Detroit. On August 21, 1919, leave was given by the Department of Agriculture to ship the hams from Richmond to Detroit. Plaintiff sent 693,216 pounds of ham to Detroit. On their arrival and inspection at the plant of the Sullivan Packing Co. these hams were condemned by inspectors of the Department of Agriculture of the United States as being unfit for human consumption, and were then converted into tankage and sold as such. The rest of the hams were then inspected at Richmond, Va., and inspectors of the Department of Agriculture condemned 641,216 pounds of them as unfit for human consumption, and they were converted into tankage and sold as such.
The average maximum and minimum temperature and rainfall to which the hams were exposed from January to August, 1919, is set out in the findings. The exposure of the hams to this range of temperature and humidity, together with their age, caused the condition of mold. By May 25, 1919, the mold was black and slimy and had penetrated in the seams to such an extent that the great bulk of the hams could not be reconditioned.
The plaintiff exercised diligence in handling the hams after they were delivered to it. They were at once placed in cold storage, the effect of which was to maintain them in the same condition in which they were at the time they were placed in cold storage. Steps were at once taken to have them reconditioned, but that was found to be impossible.
The plaintiff paid to the United States for the hams the sum of $280,674.90; it salvaged the sum of $57,123.13, and lost in all in this transaction the sum of $223,551.77. It is agreed that the plaintiff owes the United States the sum of $116,582.50 with interest from- December 31, 1924, on another transaction between the parties.
It thus appears from the facts found that the plaintiff, through no fault on its part, came into possession of approximately a half million pounds of unfit hams; that the Government received $280,000 for them; that they were shortly after coming into its possession condemned by the Government as being unfit for human consumption and had to be sold for tankage; that the plaintiff has lost by this transaction at least $260,000; that when the plaintiff filed its claim *463 for a refund of this rponey with the War Department its claim was rejected solely upon the ground that the plaintiff’s money had been deposited in the Treasury of the United States and that having been so deposited it could not be drawn therefrom in the absence of a specific- appropriation by Congress. Now, the United States undertakes to retain this money in its Treasury while not denying the main facts above recited. Common honesty demands that the plaintiff shall be paid for the loss which it has incurred through its reliance upon representations made to it by officers of the Government, and upon which it had the right to rely, unless the law invoked by the defendant is so imperative in its character as to preclude all right of recovery by the plaintiff.
Moreover, the plaintiff did not receive what the Government undertook to deliver to it. The plaintiff did not get hams, sound and sweet, but grease, which was sold for tank-age. In such a case it is only honest that the Government should return the money which it has received for something which it never delivered to the plaintiff. Leavitt v. United States, 60 C. Cls. 952.
The contention turns upon the language used in the circular telegram and in the circular letter of May 21 and May 22, 1919, respectively. The Government contends that the language used was merely a description of the hams, which put the buyers upon notice and devolved upon them the duty of inspection, and failing to do so they assumed the risk that the article they were buying was merchantable, and if any loss has been suffered the Government can not be held liable. The doctrine of eaveat emptor is invoked. And the argument is made that the plaintiff has forfeited its rights by its own laches and negligence.
The plaintiff asserts that the language used in the circulars constituted material representations having the effect of a warranty, and that the statements in said circulars were representations that the hams offered for sale were in fact actually as stated in the circulars; that it had the right to rely upon these representations as to the condition of the hams, that these representations were made by officers of the United States acting within the scope of their authority, and *464 that it was not obliged to.inspect tjie hams; that the only-purpose of such inspection in face of the statement made in the circulars would have been for the purpose of .showing that these statements were false, and such an inspection for such a purpose it was not obliged to make.
The statements as to the condition of the hams was without qualification or limitation. Bidders were not invited to make an inspection; they were not informed that they must take goods “ as is ”; they were told the hams were “ sweet and sound, but surfaces are affected by mold and that if reconditioned at once would be no loss from trimming, as mold in its present condition can be removed by thoroughly washing and cleaning.” They were not told what the officers knew from the report of Government inspectors, that the hams “ are affected by the extensive growth of molds of various varieties.”
It appears from the facts found that there was made by the United States a representation of the condition of the hams which was not true, and that the plaintiff was misled by it. The officer making the statements which we are considering was authorized to make them, and the plaintiff had the right to rely on any representations made by him which pertained to .the condition of the goods offered for sale. The plaintiff was told that the hams were sweet and sound, but surfaces were affected by mold, and that if reconditioned at once there would be no loss from trimming, as mold in its then present condition could be removed by thoroughly washing and cleaning. That was a positive statement of the character of the goods which were offered for sale, and the plaintiff had a right to rely on it, for it was so worded as to create and justify the belief that it was intended to enter into the contract which was afterwards made, and, in fact, the circulars were made part of the contract afterwards entered into between the parties. It was a representation which amounted to a warranty, particularly in this case, as the defendant knew and spoke with authority as to the character and condition of the hams, while to the plaintiff their character and condition were unknown. The duty to inspect the hams was not imposed upon the plaintiff. When the statement of the Government left in no doubt the fact *465 stated by it, no inspection by the plaintiff was required. If the Government wished to leave the matter open to the independent investigation of the plaintiff, it might easily have omitted from its circulars the statement as to the character and condition of the hams. In its positive assertion of their character and condition it made a representation upon which the plaintiff had a right to rely without an inspection to prove its falsity. United States v. Atlantic Dredging Company, 253 U. S. 1; Atlantic Dredging Company v. United States, 53 C. Cls. 490; United States v. Stage Company, 199 U. S. 414; Hollerbach v. United States, 233 U. S. 165; United States v. L. P. & J. A. Smith, 256 U. S. 11.
The Government lays stress upon what it calls the negligence of the plaintiff in failing to recondition the hams immediately upon their delivery. But we think that the evidence discloses that the plaintiff used due diligence in attempting to have the hams reconditioned. Moreover, no amount of diligence could have availed, as the hams were unfit for human consumption when they were delivered to the plaintiff.
It is contended by counsel for the Government that in any event the plaintiff can not recover, since, the contract was not “ reduced to writing and signed by the contracting parties with their names at the end thereof,” as required by Revised Statutes, section 3744. But it is settled that the invalidity of a contract because of a noncompliance with the above section is immaterial after the contract has been performed. United States v. Andrews &. Co., 207 U. S. 229. The contract in suit has been performed by the delivery of the goods and the payment of the money.
We are of opinion that the plaintiff is entitled to recover the amount found to be due in the conclusion of law, and judgment will therefore be entered for the plaintiff in the sum of $99,644.
It is so ordered.
Graham, Judge; Downey, Judge; Booth, Judge; and Campbell, Chief Justice, concur.