Howry, u.,
delivered the opinion of the court:
Authority was conferred by an act approved March 3,1887, upon the Secretary of the Navy to have constructed a new Naval Observatory on Georgetown Heights, in the city of Washington, D. C.
Pursuant to that authority, the Secretary invited proposals for the construction and erection, by contract, of nine buildings. The specifications with plans (except certain details of work and materials relating to the construction of floors, piers for instruments, and equatorial domes) were to be had on application, and proposals were to be made in accordance with forms to be furnished. It was required that each proposal should be accompanied by a satisfactory guaranty that the bidder would, within twenty days after the receipt of notice of acceptance, execute the required contract and give a bond, with satisfactory surety, conditioned for the faithful performance of the contract within eighteen months after it was made.
A bid by plaintiffs for this work was accepted June 29,1888, but the contract between the parties was- not actually executed until October 2,1888. It does not appear whether any unusual preparation for the undertaking was made by plaintiffs between those dates.
The building lines not having been designated until November 2, 1888, active work on the buildings was not begun until that time. Because of delay in the execution of the contract and the omission of the engineers to designate building lines, the contractors applied for and obtained an extension of time for the completion of the work to October 1, 1890. Three extensions of time to complete were subsequently granted on the application of the contractors.
With an extension of time to their credit of nearly two months, plaintiffs abandoned the work September 3, 1891, before it was finished, and thereupon the contract was by proper authority declared forfeited.
After forfeiture the buildings were completed under a new contract. The cost of completion was charged to plaintiffs, and an account was rendered to them showing the debits and credits to which each party to this action was entitled under the original contract with the authorized additions. A balance appearing in plaintiffs’ favor, the amount of it was paid *184 to them on the order of the Secretary of the Navy. Subsequently plaintiffs suggested an error of $2,864.80, with a view of having the same corrected. The Secretary declined to I’efund the amount asked, whereupon the plaintiffs brought this action.
The claims, tabulated from the amended petition, are as follows:
1. Delay until October 2,1888, in the execution of the contract. $4,500. 00
2. To extra expenses incurred, on account of enforced delays of the work by the Government, April 22, 1890, to September 8, 1891, for enforced idleness for said period of watchmen, drivers to teams, a foreman and engineer, blacksmith and helper, a clerk, timekeeper, office boy, teams and feed of horses, cost of maintaining separate office for assistant Government architect, making a total of §13,714.50; lossoftime and opportunity to each member of the firm for eighteen months, at $200 per month, $10,800; profits lost, which might have been made if other contracts could have been taken during these eighteen months, $6,150; amount paid general laborers, not above enumerated, $10,000; total of these items. 40,673.50
3. Materials furnished and work done by the contractors on the buildings and appurtenances on account of mismanagement and delays of defendants, which cost the contractors $374,-059.96, upon which a commission of 20 per cent profit is claimed. 74,811. 99
4. Materials furnished and work done extra to the contract ... 29,371. 35
5. Materials at the site at the time of forfeiture, and appropriated by defendants. 24,478. 35
6. Exclusion of Davis, one of the contractors, without just cause, from the management and direction of the work for a year and a half during the life of the contract (necessitating the employment of an extra foreman at $5 per day). 27,250.00
7. Failure to pay the full amount of 90 per cent of the value of the work at the times specified by the contract, but withheld, to the embarrassment of the contractors in arranging payment for materials and labor, compelling them to borrow-money and to pay interest. 2,588. 77
8. An improper charge against the contractors on account of salary of the assistant architect of said buildings and traveling expenses of the architect... 2,564.80
These demands are so inconsistent witb an apparent adjustment of the matter after the completion of the work, and are so earnestly urged as just, the items will be considered upon their merits irrespective of the supposed settlement.
*185 Respecting delay in the execution of the contract, it is argued for the plaintiifs that the advertisement and specifications were complete when submitted for bids, and that the acceptance of the proposals for doing the work constituted a. contract without the formalities of a subsequent written agreement; and although it is conceded that the Secretary of the Navy was bound by law to make a formal contract, nevertheless it is insisted that it was his duty not to delay doing so to' the damage of the bidders.
The defense is rested upon the ground that plaintiffs did not complete the execution of the bond conditioned for the faithful performance of the work until a few days before the contract was formally executed; and, secondly, that the matter of delay was subsequently submitted to the Secretary of the Navy with a view of securing an extension of time only, which was granted.
The statutes relating to public contracts, some directory, but others mandatory, are not interposed by way of defense to this branch of the case (secs. 3744-3747); but section 3744 of the Revised Statutes provides that “it shall be the duty of the Secretary of War, of the Secretary of the Navj-, and of the Secretary of the Interior to cause and require every contract made by them severally on behalf of the Government, or by their officers under them appointed to make such contracts, to be reduced to writing- and signed by the contracting parties ivith their names at the end thereof. ” This statute is mandatory. (Clark v. United States, 95 U. S. R., 539; South Boston Iron Company v. United States, 118 U. S. R., 37.) Operative as a statute of frauds, it makes contracts not reduced to writing and signed by the contracting parties void.
The preliminary advertisements, specifications, and proposals and acceptance of proposals must be viewed as becoming a part of the statutory contract when a contract was executed as required by statute, but until then only the negotiations necessary to the execution of a formal contract. The exception noted in the books that a parol contract wholly or partly executed on one side entitles the party performing to recover the fair value of his property or services as upon an implied contract for a quantum meruit has no application here.
Independent of the statute, while the contractors were no *186 doubt waiting on the Secretaiy, thej1- were quietly doing so and presumably engaged in business profitable to themselves, although it does appear that the contractors declined to accept other contracts.
They made no effort, however, to complete the preliminaries. It does not appear that anj^ demand was made for the formal execution of the contract, or that any request was preferred bjr them to be permitted to proceed, or that they tendered any bond in advance of the time the matter was actually closed. They seem to have begun wort without protest or even an intimation that they had been subjected to an unfair delay in the execution of the formal contract, and under these circumstances we must presume that the failure to submit the formal contract for execution at an earlier time did not materialfy prejudice the interests of the contractors. While it was not necessarily imposed upon plaintiffs to make any demand for the execution of the formal agreement or to tender a bond in advance, their silence is sufficiently suggestive of acquiescence in the delajr attending the submission of the formal agreement and the signature of the proper parties.
Soon after beginning work the contractors asked credit for an unavoidable delay, stating that they had not been able to start active work on the buildings until November 2, 1888, as on that day the Government engineers furnished them with building lines.
The neglect of plaintiffs to make any specific complaint of the failure of the Government to designate the building lines in October (neither the original nor amended petitions disclosing any such complaint), and the omission on the part of plaintiffs to bring to the attention of the court on the first hearing the particular items going to make up the alleged loss or damage to them by reason of the delay in question, led the court to treat the failure of the Government to designate the building lines earlier as inconsequential and immaterial. In view of the contention of the contractors that they supposed the allegation of special damage on this account was embraced in the general allegations made bjT the pleadings, an amendment has been authorized and made. On this amendment the evidence has been reviewed with the result established by the findings that for the twentj^-eight days after the exe *187 cution of the contract plaintiffs were actually waiting for the Government to indicate where the work should begin.
The tenth clause of the agreement required the collection and preparation by the contractors of stone, brick, and other materials without delay and to commence work at the site within twenty days from the date the contract was signed. Making due allowance for everything calculated to keep the contractors in suspense during the month of October, and giving effect to all the circumstances in their relation to the readiness of the contractors to proceed had the building lines been established earlier, the actual loss and damage to plaintiffs could not have exceeded $780, and the court has so found.
It was the duty of defendants to furnish building lines at once without request, from plaintiffs. (Figh's case, 8 C. Cls. R., 319.)
Extra expenses incurred “on account of enforced delays of the work by the Government, April 22,1890, to September 8, 1S91,” are next alleged. This part of the petition is indefinite (for which a motion by defendants to make more definite and certain could have been made) in not stating whether the delays complained of were before or after the day first mentioned. Interpreted by the proof, however, we find the allegation to mean that but for the fault of the Government before April 22, 1890 (and not between the dates given), the contract could have been completed bj^ that time, and because of inability to complete as stated, the expenses of plaintiffs subsequently incurred should be charg’ed to the United States.
Though these extra expenses are meant to be charged for the faults of the Government anterior to the date first given, a larger item yet appears partly on the same account, but not limited to anjr portion of the time of plaintiff’s undertaking.
The sum of $71,811.99 is claimed by way of profits lost on expenditures forced on plaintiffs “on account of mismanagement and delays of defendants.” These profits are figured upon an alleged outlay of $374,059.96 in attempting to carry out the contract. Should these be allowed, plaintiffs would thus recoup their alleged losses.
Assuming that the contractors did lose money on their general undertaking, as they allege, the proof yet must show such *188 fault on the other side as to have caused unnecessary expenditures by plaintiffs before profits or damages can be given.
The alleged mismanagement of the Government agents is necessarily interwoven with the alleged causes of the delays; but here again we deal with an indefinite complaint, because the pleadings do not show specific acts of mismanagement. Defendants might well have relieved the court of the unnecessary labor of investigating the entire record by a motion to compel plaintiffs to be more ' definite and certain on this point. Failing in this, however, we gather the following from the briefs:
First. There is a complaint of the failure of the Secretary of the Navy to make at an earlier time special contracts for the construction of piers for instruments under those buildings where instrument foundations were not covered by the general contract.
Second. A general complaint against the architect and his-assistant (more particularly the latter) because of methods adopted in making changes in the buildings.
Third. The abuse of authority in the inspection of work and material.
Fourth. Complaint of the enforcement of the rule provided for in the contract for the maintenance of order during the progress of the work.
The rules which govern contracts like this are settled. One is that if a party by his contract charge himself with an obligation possible to be performed, he must make it good, unless his performance is rendered impossible by the act of God, the law, or the other party. Difficulties, even if unforeseen, and however great, will not excuse him. If parties have made no provision for a dispensation, the rule of law gives none, nor, in such circumstances, can equity interpose. (Dermott v. Jones, 2 Wall., 1; Cutter v. Powell, 2 Smith’s Leading Cases 1, 7 Am. ed.)
Another rule is that it is competent for parties to a contract - of the nature of the present one to make it a term that the decision of an engineer, or other officer, of all or specified matters of dispute that may arise during the execution of the work shall be final and conclusive, and that in the absence of fraud or of mistake so gross as to necessarity imply bad faith, *189 such decision will not be subject to the revisory power of the courts. (Kihlberg v. United States, 97 U. S. R., 398; Martinsburg and Potomac Railroad v. March, 114 U. S. R., 549; Chicago and Santa Fe Railroad Co. v. Price, 138 U. S. R., 185; United States v. Gleason, 175 U. S. R., 602.)
The third, fifth, tenth, and twentieth paragraphs of the contract give the Secretary of the Navy, or persons appointed bj'him, the power to finally determine “any doubts or disputes arising as to the meaning of anything in the drawings, plans, or specifications,” and the contractors bound themselves to abide by his or their decision in the premises.
Paragraph 3 provides for a board of naval officers who had authority to pass upon changes involving an expenditure in excess of §500, and the contractors bound themselves to abide by its determination. Such changes could not be made except upon a written order of the Secretary of the Navy. For changes involving an expenditure of less than the amount stated an agreement in writing was necessary between the contractors and the architect, but subject to the approval of the Secretary.
Paragraph 5 makes the decision of the architect upon all questions concerning material and workmanship final.
Paragraph 10 provides that no delay attributed by the contractors to the Navy Department, its officers, or agents, could be considered by the Secretary of the Navy unless the contractors should at the time of the occurrence of such delay notify the Secretary in writing of the facts and circumstances in each case and of the extent that the final completion of the work was thereby delayed.
Some two months after the execution of the principal agreement plaintiffs did not solicit the work, but submitted a bid for a part of the work relating to the construction of piers for instruments. This bid' was subsequently accepted, but not until the winter was over. In the meantime plaintiffs applied for an extension of time to complete the general undertaking. Their application was made some time in January, 1889, and was rested upon the delay of the Government in deferring the execution of any contract until October, 1888, upon the bid accepted June 29, previously, and because active work on the buildings had been retarded for want of *190 building lines. These two considerations, they stated, lost to them the working season of 1888. This «7 anuary letter was followed by another, dated February 18, 1889, declaring the impossibility of completing the work within the time first fixed. The extension was formally granted March 1, 1889, the Secretary of the Navy referring in granting the extension to a recommendation of the architect, made in the early part of the winter, that foundations for the buildings ought not to be laid during the winter months, in consequence of which the Secretary stated ho had “ authorized” a delay in the commencement of the work on the buildings.
Plaintiffs’ progress with the work was unquestionably interrupted from February 23, 1889 — the date of the Secretary’s order — to Majr 3, 1889, because of the inadvisability, in the judgment of the architect, of continuing the work in the winter. For the same reason it was interfered with by the verbal direction of the Secretary of the Navy to the contractors (through the architect) earlier in the winter, and because of the neglect and failure of the Government to locate foundations for instrument piers to the building which, under the first contract, plaintiffs were obliged to build. How much the interference was does not fully appear, as the authority to stop work and the order of February 23, 1889, did not interrupt all the work. Their work was also interrupted from time to time during the summer of 1889 and until September 5 of that year, because of the neglect and failure of the Government to locate foundations for instrument piers to another building. Finding x discloses facts which justify the assessment of damages on these accounts in the sum of $3,675.
The interruption to plaintiffs by the neglect and failure of defendants to locate foundation for instrument piers to another building damaged plaintiffs to the extent of $948, for which an allowance is also made in the tenth finding.
On account of an error in directing the formula of the concrete to be used in the construction of the foundations for instrument piers, plaintiffs also had their work interrupted. Finding xl establishes the amount at $668 for this delay and interruption.
The complaints of mismanagement relate to changes in the plans and the methods adopted for the inspection of work and *191 material. These complaints involve charges against the architect or his assistant, and really constitute the gravamen of this entire proceeding.
Under the rules stated ante, fraud or failure to exercise an honest judgment must appear in the 'conduct of the officer involved. The burden of proof is upon plaintiffs to establish such fraud or dishonesty.
The contract is free from ambiguity, as to the right of the Government to make changes and to direct inspection of work and material. It is surprising that charges so grave as those directed against the architects should not appear by specific allegation of fraud or mistake in the pleading. The petition contains a general charge of “mismanagement and delays on the part of defendants,” but does not specify a single act of mismanagement except in the most general terms.
The requests for findings of fact are equally general and deficient. They ought not to be taken more seriously than plaintiffs themselves estimate them as grievances. In none of these requests, except by implication, can be found charges of fraud or dishonesty against the Government agents. Where, then, are we to begin to upset the decisions of the architects?
Waiving the insufficiency of the allegations, however, the findings show the rejection of brick, the condemnation of marble, a requirement to discharge a careless employee, and finally a complaint against one of the contractors for failure to preserve order himself, followed by an .order resulting in his ejection for a time from the grounds.
We have carefully considered everything presented relating to the hindrances caused by the conduct of the Government agents, and especially to those relating to the conduct of the assistant architect against whom the complaints are principally directed. But taking the entire proof, we are unable to adopt the views of the able counsel who have presented this cause so earnestly for plaintiffs. That the architect and his assistant were rigorous in the discharge of their duties; that they required the contractors, in the materials and workmanship used and applied, to use and apply that which was “first-class and of the very best quality unless particularly set forth in the drawing, plans, and specifications,” and that the archi *192 tect’s assistant may have been personally disagreeable and sometimes too exacting- is probable, but we feel sure that out of the facts found no conclusion of fraud or gross mistake can arise sufficient to necessarily imply bad faith or failure to exercise an honest judgment.
. As to the damag-es claimed for the causes leading to annulment of a contract with an employee named Fink, it majr be observed that with an opportunity to show that an injustice had been done in the order directing the discharge of Fink the contractors did not avail themselves of the privilege at that time. The contract provides that “only skilled, competent, and fit workmen shall be employed on the work, and the architect may by written notice require the parties of the first part to dismiss anjr employee he may deem incompetent, careless, or otherwise objectionable on the work.” Though the contractors denied that Fink ivas doing bad work, or that they had knowledge of threats on his part of personal violence to the inspectors, they expressed a willingness to comply with the request to discharge him, and hoped they would be able to convince the architect that an injustice was being 'done. The record does not show that 'any other effort was made b}T them to have Fink remain, and having acquiesced in the order of the inspector we must take it for granted that his action was proper.
The eighteenth finding discloses conditions under which one of the contractors was excluded from active participation in the-management. Differences arising between this contractor and an inspector in the methods adopted by the contractor in laying brick, an altercation ensued, resulting in the use of insulting language of and concerning- Davis (the contractor) by the inspector, who in turn was violently assaulted by Davis. From this occurrence, after some correspondence, an order resulted excluding- Davis from active participation in the management. The contractors made no objection to the order at the time, and no intimation of inconvenience or damage appears beyond the employment of a foreman to ■superintend the laying of brick. Reference to the finding will disclose the circumstances in full.
With the merely personal features of the controversy which led to the order we have nothing to do. Disobedience of the *193 proper orders of tbe inspector did not justify the use of language by him personally insulting. On the other hand, as a subordinate giving orders under a written agreement, he was entitled to protection from the attack of the contractor. The means of protection taken, however, was unenforceable had Davis chosen to resist the order, because of his right to continue in active management of work which he had bound himself with others to do within the' timo fixed by the agreement. True, the provision' which made the contractors responsible for good order ab,out the structure operated upon them as well as upon their men, and thejr were bound to observe that provision as wéll as the other obligations of their agreement. Put they were not' employees within the meaning of that term of the contract, which authorized the architect to dismiss employees deemed objectionable.
The contractors did not, however, resist the order. Their letter seems to bo something of an admission that Davis ivas at fault. They made no effort to have him retained in active charge. They made no effort to have him reinstated. Pie may have proved useful elsewhere in advancing the work. No account is offered as to what use .he made of his time in the period of his absence. It was his duty to diligently endeavor to find employment during the time damages are claimed from defendants if he was not actively useful on their own undertaking. Failing to shoiv that ho reasonably exerted himself to prevent or diminish damages, the claim can not bo allowed.
On the item on account of interest alleged to have been paid by plaintiff's for defendant’s neglect to pay promptly the percentage required by the contract on the- value of the work as it progressed, it does not appear that these payments were unlawfully withheld. But oven if they were, there can lie no recovery under the statute for interest paid in borrowing money to carry on the work. (Rev. Stat., sec. 1091.) Interest presented in the guise of an extra expense or damage in some other form can not be collected. (Myerle, executor, v. United, States, 33 C. Cls. R., 1.)
The extra work and material (exclusive of amount claimed for annulment of the Fink contract) for which payment is demanded is fixed at $25,121.35. This and items aggregating *194 $24,478.35 for condemned materials alleged to have' been appropriated and used by the Government without compensation to plaintiffs can be considered together, in view of the proceeding taken subsequent to forfeiture of the contract.
If forfeited, the contract provides—
‘‘The Secretary of the Navy shall thereupon cause to be taken and filed a full and complete statement and inventory of all work done or commenced in, upon, or about the buildings, appurtenances, and fittings, and of all materials on hand applicable thereto, and shall cause the same to be duly valued by a board, consisting of not less than five persons qualified by knowledge and experience for the discharge of their duties, to be appointed bj^ the Secretary of the Navy, which board shall proceed, without unnecessary delay, to examine such work and materials and ascertain and declare the fair market value thereof, including a reasonable and customary margin of profit upon so much of the work as shall have been, at the time such forfeiture is declared, satisfactorily performed; and upon such an examination the parties of the first part may attend in person and by counsel and submit such evidence as the board may deem proper.
“ In case the Secretary of the Navy shall proceed to complete the work such procedure shall be without unnecessary delay, and shall be at the risk and expense of the parties of the first part, who shall be chargeable with any increase in the cost of materials or labor incurred bjr reason of their failure to perform the contract. Upon final settlement of the liability of the parties of the first part an account shall be stated substantially as follows:
“ The parties of the first part shall be chargeable—
“1. With all advance payment.
“ 2. With the extra cost, if any, of materials and labor and all other extra expenses, if any, over and above the contract price, incurred in the completion of the work.
“They shall then be credited with the value of the work done up to the time of suspension, and of the materials on hand as ascertained by the board and approved by the Secretary of the Navy under the provisions of the fifteenth clause of this contract, and with such advanced payments, if any, as may have been refunded.”
An inventory was taken and an appraisement was made by a board duly appointed. The report of the board was approved by the Secretary of the Navy. Upon completion of the buildings an account was rendered showing a balance due to plaintiffs under their original contract, with authorized *195 additions, of $13,338.33. A statement of the account was approved by the Secretary of the Navjr, and was, on February 16, 1894, submitted to plaintiff's. The balance shown by the account was paid to them on the order of the Secretary, July 12, 1894. Plaintiffs executed vouchers for this payment without protest or claim of-lanjr kind that the amount was incorrect.
No penalties for failure to .comply with the terms of the contract were assessed against plaintiffs, nor were any claims of any kind presented to the board for allowance. No exceptions were filed to the return of the board before the Secretary of the Navy.
An account rendered and not objected to within a reasonable time is to be regarded by the party charged as prima facie correct. But five months after the settlement plaintiffs objected to one of the items only. If this objection is .deemed to be within a reasonable time and the other items considered nnobjected to, the latter items are to be regarded as covered by the admission (Wiggins v. Burkham, 10 Wall., 129). This authority holds that reasonable time becomes a matter of law when the facts are clear. By acquiescence, then, we think the account rendered became stated for all items in it except the one to which objections were made, and as to that one item the account was also stated if not objected to within reasonable time. It thus devolves upon plaintiffs to impeach the account as far as it may be considered stated by proof of unfairness or mistake in law or in fact.
It is argued that the board'erred in basing its estimates of the value of the work done and materials on hand by ignoring thecurrentpric.es of the cost of the work to plaintiffs; and inasmuch as the labor and materials cost the contractors an amount alleged by them to equal $374,059.96, plaintiffs insist that the estimate of the board, made under the fifteenth clause of the contract, proceeds upon a misinterpretation of its terms.
If this proposition be true, then, assuming the cost to be as stated by plaintiffs and allowing thereon the claim of 20 per cent commission, plaintiffs would receive in return, on account of expenditures and profits alone, a total of $448,870.95. Thus, on contracts entered into by the Gov *196 ernment for the sum of $313,164.35 (which includes authorized additions), plaintiffs would have the Government pay $135,706.60 more than it agreed to pay.
Again, on the statement of what the}*- paid out and what they admit to have received, plaintiffs ask the Government to refund their loss, if,, in any event, profits on their alleged outlay can not be paid. These would be remarkable results on a forfeited contract and a handsome premium to pay for work abandoned and failure to meet obligations voluntarily assumed in view of the remission of penalties for abandoning the undertaking.
Next, it is argued that the board erred in basing its estimates of the value of the work done and materials on hand by ignoring the value of the extra work and material.
No findings appear to establish the plaintiff’s losses, because,, in the view we have of the rights of the parties, the cost of the undertaking can not enter into the final calculation. If the cost of the undertaking exceeded the contract price, with authorized additions, any finding based on this excess cost would rest on an immaterial issue, unless by some act or fault of the Government the contractors were defrauded. Such we do not think was the case.
If the cost of labor and material in the open market fixed the fair market value of the labor and material required to be appraised, then the contract price became inapplicable to the work in an incomplete condition. According to this reasoning, for completing the work the Government would pay $313,164.35, while for not completing it the Government would be liable, if plaintiff’s allegation of current cost be true, for $374,059.96. If this was the kind of a contract the parties made, plaintiffs took no risk, but the Government assumed it all in the beginning. If the contract price was profitable, the plaintiffs got the benefit of it; if unprofitable, they lost nothing. This reasoning, however, will not do. The Government did not intend by its contract to hold out inducements, to be availed of at any stage of the proceedings, for a forfeiture. The fair market value of labor and material subject to appraisement was the contract price for doing certain work into which the labor and materials were put. Plaintiffs understood the contract to mean what the Secretary *197 of the Navy understood it to mean, for they agreed to refund, in case of forfeiture, as for liquidated and ascertained damages, a sum equal to the aggregate amount on account of the work, to enable the Government to complete the job within the contract price.
The claims for extra work and material rest upon what plaintiffs term the arbitrary disregard of their rights in the orders given by the architect’s assistant. It is asked that these items be enforced upon an implied contract for a quantum meruit, and they are discussed by both sides upon their merits, irrespective of the apparent disregard of the terms of the contract excluding extras unless duty authorized.
The architects were without authority to order changes which increased the cost to the defendants where the expenditures were less than §500, unless an agreement setting forth fully the reasons and stating the quantities and prices was first approved by the Secretary of the Navy. The plans could not be changed when the cost exceeded §500, except upon the written order of the Secretary; and changes involving expenditures in excess of said sum, with the actual cost, had to be first determined by a board on changes. If extra work was done on the order of a subordinate having no authority to give the order, which increased the cost to plaintiff's, it is their misfortune. No contract can be implied, even though defendants may .have reaped a material benefit, without proof of an order from the proper authority showing a •waiver of the express provisions of the agreement. Extra work done on the order of the local assistant architect who supervised the work was prohibited. The contract could neither be enlarged nor changed bjr a subordinate, and even in the case of an assurance that additional compensation would be allowed, such an agreement is inoperative and void. (Hawkins v. United States, 96 U. S. R., 689; Ferris v. United States, 28 C. Cls. R., 332; Driscoll’s case, 34 C. Cls. R., 524.) The doctrine of quantum meruit applies only when the defendants have derived a benefit from a partial performance of the agreement which they could have abandoned or rejected, and which exceeded in value the damages sustained by them when the failure to perform is the fault of the plaintiffs.
Various explanations are now given for complying with the *198 orders of the architect in doing the work, now claimed to be extra, without conforming to the requirements of the contract. These explanations are not necessary to be considered to properly determine the cause, but are adverted to- to show how little there is in them to excuse failure to follow the express terms of the original agreement.
It is said that at the time of the order for excavating cellars the board on changes had not been appointed. This is true. The excavations for cellars were oi-dered January 11, 1889, and the board was appointed eleven days thereafter. But plaintiffs’ acceptance of the decision of the architect, that the cellars were covered by the specifications, is conclusive that the decision of the architect at the time was correct. In anjr event they were not relieved from appealing to the Secretary of the Navy if the work was deemed by them extra at the time it was ordered. No pretense of an appeal was made to the board on changes, or to the Secretary, for the alleged changes in the system of ventilation or for plastering ceilings. For putting copper on the balcony of the main building the plaintiffs say they were denied the right to have the matter brought before the board on changes. The proof is insufficient to establish this. In the matter of changes in the staircase and elevator, though plaintiffs say they were intimidated by the architect, the proof is insufficient to establish any intimidation. Respecting the floor connecting corridor between the small-equatorial and main transit rooms, there seems to have been a reference of a difference to the board on changes, but no contract was made between the parties, nor did the Secretary of the Navy have any knowledge of any controversy respecting these two small items. In the matter of extra tile, plaintiffs state that had this matter been submitted to the board on changes the decision would probably have been in their favor. And yet there was no appeal. The other small items are in the same condition.
The findings dispose of claims for the value of material owned by plaintiffs and alleged by them to have been appropriated by defendants. The provision investing title in the United States to all suitable material on hand at the time of forfeiture did not include condemned material. That belonged to plaintiffs. But without clearer proof of the appropriation *199 by defendants of condemned material on the site of the structure at the time of forfeiture we are bound to assume that the process against plaintiffs under which certain material on the ground was sold (and purchased in plaintiffs’ interest) included all they had.
If plaintiffs have -shown any merit in the items considered, a material question remains to be finally determined, as to the effect of the execution of the vouchers and the receipt of the money in supposed final settlement of claims under the contract.
After reciting- that upon final settlement of the liability of the parties an account should he stated, the contract provides: ’"If a balance shall thereupon appear in favor of the contractors the same shall be paid to and accepted by them in full discharge of all claims under this contract.” Whatever, then, was agreed to must be taken and held to be a matter of voluntary adjustment, in its nature final and conclusive, irrespective of any judicial power possessed by the board which made the report; and in this respect the case is not unlike those of United States v. Adams, 7 Wall., 479; Mason v. United States, 17 Wall., 73.
With knowledge of what the board had done, plaintiffs presented no claims for extra work or material, and offered no objections before the Secretary of the Interior to any part of the account. This, avc think, they Avere obliged to do under the contract, for purposes of adjüstment, before executing the A'ouchers and receiving the balance stated to be due in final settlement.
It is true in general that payment of part of an admitted sum forms no consideration lor the release of the residue. But here plaintiffs executed A’ouchers Avhich induced the settlement and created the impression that other'claims of a like character Avere A'oluntarily relinquished. It has been held that a certificate given under such circumstances operated to release demands which might have been considered. (Coulter v. Board of Education, 63 N. Y. Rep., 365.) The receipt should be construed in connection with those provisions of the contract which authorized an inventory and an appraisement of all authorized work, inclusive of materials on hand, and the statement of an account Avhich should include all *200 proper charges against the contractors in default in completing the work. The contract did not contemplate a partial investigation of some of the matters of which the board had jurisdiction nor an approval by the Secretary of part, leaving the other demands on account of the same work open to further investigation and adjustment upon the installment plan. It was the intention of both parties to release all claims for work done under the contract,- and if other claims for work existed at that time they were disputable.
The transaction became an accord and satisfaction for the subject-matter considered. (Murphy v. United States, 14 C. Cls. R., 508; 104 U. S. R., 464.) This includes the charge against plaintiffs on account of the expenses of the architects.
It is true that after the settlement plaintiffs took exceptions to the correctness of the charge against them for the assistant architect’s salary and traveling expenses of the architect. But these exceptions were presented to the Secretary of the Navjr some months after the close of the transaction, which was an unreasonable time. Plaintiffs predicate their exemption from these charges upon the ground that they were not a part of the extra cost of materials and labor, and the further ground that the contract did not contemplate any other extra expenses unless the same Avero over and above the contract price. •
The seventeenth paragraph of the contract' provides that “in case of annulment the contractors shall be charged with the extra cost, if any, of materials and labor, and all other extra expenses, if any, over and above the contract price included in the completion of the work.” These charges were extra expenses. They would not harm been incurred had the plaintiffs complied with their contract. The work was not completed until February 31, 1893. It was plaintiffs’ fault that caused the necessity to keep an assistant architect on the grounds until completion. It is not to bo expected that the Government should dispense with the supervision of the principal architect, who was under the necessity to leave his office in New York from time to time to supervise the work of his assistant and the last contractor. If the alleged overcharge was open for consideration it should not be deducted from the account on plaintiffs’ theory that the3r were not responsible for the extra time consumed to complete. This in effect *201 would make the Government responsible for their default, which was not the case.
The award of the board and the settlement thereunder not being successfully impeached for eithet' fraud or mistake, the settlement became final as to the subject-matter covered by it.
It can not be said, however, that the vouchers were intended to cover those matters not within the province of the board to consider or the jurisdiction of The Secretary to allow. The parties are presumed to have understood their rights and remedies enough to know that claims for damages on account of hindrances and interruptions in the prosecution of the work could not be entertained by the Navy Department. The Secretary was restricted in his approval of the board’s award to those matters only appearing upon the face of the account. If plaintiffs have now shown merit in. their claims for these hindrances and interruptions thejr are entitled to judicial redress. The findings establish the amount of these claims in the aggregate sum of $7,311 (as' hereinbefore set forth in detail), and for the aggregate sum found judgment will be entered for plaintiffs.