## OLTEDALE v. UNITED STATES.

### No. 14.

District Court, D. Rhode Island.

May 27, 1941.

John E. Mullen (of Mullen & Roberts), of Providence, R. I., for plaintiff.

George F. Troy, U. S. Atty., and Joseph Veneziale, Asst. U. S. Atty., both of Providence, R. I., for defendant.

HARTIGAN, District Judge.

This is an action for damages based upon an express contract entered into by the parties on August 12, 1935, by which the plaintiff agreed to manufacture and deliver to the defendant 10,000 blankets according to certain specifications, and the defendant agreed to pay the plaintiff the total sum of $48,950. The plaintiff contends that he executed the contract in accordance with the terms thereof and that the defendant has not paid the full amount in accordance with said contract, but is indebted to the plaintiff in the sum of $2,-098.09.

The defendant filed an answer admitting that the parties entered into the contract but denies: (1) that the plaintiff executed or performed said contract in accordance with the terms thereof; (2) that the defendant has not paid the full amount in accordance with said contract; (3) that the defendant is indebted to the plaintiff in the sum of $2,098.09.

The defendant further alleges that the plaintiff did not perform his said contract in that he failed to complete the blankets at the times required by said contract and that said $2,098.09 was retained by the defendant as liquidated damages, and that the defendant paid the plaintiff in full all sums due under said contract.

The defendant further alleges that both the said contract and the Standard Government Form of Bid referred to in Article One of said contract and made a part of said contract by said Article One, contained a provision for liquidated damages in accordance with which the plaintiff was required to pay the defendant the sum of one-fifth of one percent of the price of each blanket for each day of delay after the date or dates specified for delivery in said contract.

The defendant also alleges that the sum total of said payments due to the defendant from the said plaintiff as liquidated damages for said delinquent deliveries was $2,098.09, and defendant retained said

sum as such liquidated damages for said delinquent deliveries.

The defendant also alleges that 1,830 of the blankets offered for delivery by the plaintiff to the defendant under said contract did not conform to the specification requirements and were rejected by the defendant for that reason, and later 1,724 of said blankets so rejected were accepted by the defendant at a reduction in price of 14½ cents on each blanket, and 106 of said blankets so rejected were accepted by the defendant at a reduction in price of 24½ cents on each blanket. Said acceptance of those inferior blankets was made in accordance with Article 4(c) of said contract, wherein among other conditions, the following stipulation appeared:

"In the event public necessity requires the use of materials or supplies not conforming to specifications, payment thereof shall be made at a proper reduction in price."

The defendant also alleges that there was deducted from the contract price on said 1830 blankets the sum of $275.96 and that the said deduction of this sum was agreed to by the plaintiff after said blankets had been so rejected and that the plaintiff has been fully paid by the defendant in accordance with the terms of said contract.

The defendant further alleges as an additional, separate, affirmative defense that in accordance with Article 15 of said contract the contracting officer, with respect to the said failure of plaintiff to complete the deliveries of the blankets provided for in said contract at the times required by the same, ascertained the facts of and the extent of the delay and reported his findings thereof as follows:

### Findings.

"I have examined the claim of the Bay Mill, East Greenwich, R. I., requesting refundment of liquidated damages deducted from payments made under Contract W 669 qm-ECW-327, dated August 12, 1935, and have found the following facts:—

"That the evidence of record does not show that any of the delays in deliveries for which liquidated damages were deducted from payments under this contract were caused by a delinquency of the Government in making payments for deliveries effected by the contractor;

"That the records show that the contractor offered for delivery numerous blankets that did not conform to specification requirements with the result that it was necessary to make a thorough one hundred per centum (100%) inspection of all deliveries made by the contractor;

"That no unreasonable delays occurred in inspecting garments offered for delivery and all papers necessary for payment were prepared as promptly as practicable and forwarded to the paying Finance Officer; and

"That the statement of Major S. R. Beard, F. D., Finance Officer, Philadelphia, Pa., the paying Finance Officer, shows that payments were actually made to the contractor as expeditiously as could reasonably be expected.

"L. O. Grice, (s)
"Major, Q. M. C.,
"Contracting Officer.

"April 20, 1937."

The defendant alleges that as provided in said Article 15 said findings of fact by said contracting officer are final and conclusive on the said defendant.

The case was tried to the court sitting without a jury.

There is no dispute that there were delinquent deliveries of the blankets by the plaintiff.

The plaintiff justifies the delinquent deliveries chiefly on the grounds that the Government failed to pay him the amounts due him within ten days of deliveries; that the Government caused the delays in deliveries because of its failure to promptly inspect a sample blanket sent to it on August 23, 1935; that the Government furnished the plaintiff with a defective stamp block for stamping "U. S." on the blankets, and that the Government made a change in the solution of the dye for stamping the blankets.

In the Standard Government Form of Bid (Govt's. Ex. 9) which the Government sent to the plaintiff, the following legend appeared: "Discount will be allowed for prompt payment as follows: 10 calendar days NONE per cent; 20 calendar days . . . . per cent; 30 calendar days . . . . per cent; or as stated in the schedules."

The plaintiff submitted his bid, dated August 2, 1935, to manufacture 10,000 olive drab wool blankets at a unit price of $4.895 or a total amount of $48,950. On his bid he wrote above the word "none" as it appeared in the Government's invitation for bids in the discount clause the word "net".

The parties signed the Standard Government Form of Contract, dated August 12, 1935, (Pltff's. Ex. A) although Lieutenant Colonel Grice testified that execution was completed by the Government on September 30, 1935.

Article 1 of the contract provides as follows:

"Scope of this contract.—The contractor shall furnish and deliver at the Philadelphia Quartermaster Depot, 21st and Johnston Streets, Philadelphia, Pennsylvania, Ten thousand (10,000) Blankets, Wool, Olive Drab, Model 1934, at Four dollars and eighty-nine and five tenths cents ($4.895) each, for the consideration stated totaling Forty-eight thousand, nine hundred fifty dollars ($48,950.00), in strict accordance with the specifications, schedules and drawings, all of which are made a part hereof and designated as follows: Schedule of Supplies; U. S. Army Tentative Specification dated June 5, 1935; U. S. Army Specification No. 100-2D; Standard Government Form of Bid No. 669-36-9.

"Deliveries shall be made as follows: Five percentum (5%) within thirty-six (36) days after date of this contract and five percentum (5%) each six (6) days thereafter, until the quantity contracted for shall have been completed."

Article 8 provides: "Payments.—The contractor shall be paid, upon the submission of properly certified invoices or vouchers, the prices stipulated herein for articles delivered and accepted or services rendered, less deductions, if any, as herein provided. Unless otherwise specified, payments will be made on partial deliveries accepted by the Government when the amount due on such deliveries so warrants; or, when requested by the contractor, payments for accepted partial deliveries shall be made whenever such payments would equal or exceed either $1,000 or 50 per cent of the total amount of the contract."

Article 12 provides: "Disputes.—Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer or his duly authorized representative, subject to written appeal by the contractor within thirty days to the head of the department concerned, whose decision shall be final and conclusive upon the parties hereto as to such questions of fact. In the meantime the contractor shall diligently proceed with performance."

Article 15 provides: "Delays.—Liquidated damages.—If the contractor refuses or fails to make delivery of the materials or supplies within the time specified in Article 1, or any extension thereof, the actual damage to the Government for the delay will be impossible to determine, and in lieu thereof the contractor shall pay to the Government, as fixed, agreed, and liquidated damages for each calendar day of delay in making delivery, the amount as set forth in the specifications or accompanying papers, and the contractor and his sureties shall be liable for the amount thereof: Provided, however, That the Government reserves the right to terminate the right of the contractor to proceed and to purchase similar material or supplies in the open market or secure the manufacture and delivery thereof by contract or otherwise, charging against the contractor and his sureties any excess cost occasioned the Government thereby, together with liquidated damages accruing until such time as the Government may reasonably procure similar material or supplies elsewhere: Provided further, That the contractor shall not be charged with liquidated damages or any excess cost when the delay in delivery is due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God or the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather but not including delays caused by subcontractors: Provided further, That the contractor shall, within ten days from the beginning of any such delay, notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and extent of the delay and his findings of facts thereon shall be final and conclusive on the parties hereto; subject only to appeal, within thirty days, by the contractor to the head of the department concerned, whose decision on such appeal as to the facts of delay shall be final and conclusive on the parties hereto."

On sheet No. 3 of the Schedule of Supplies, which is part of the formal contract, there appears the following legend: "10. Terms of payment: Discount will be allowed for prompt payment as follows: 10 calendar days Net %: ... "

In the Standard Government Form of Bid which is attached to the formal contract and which purports to be a copy of

the bid submitted by the plaintiff on which he wrote "net" over the word "none", as previously indicated, the word "net" does not appear and the provision in regard to discount is the same as on the original invitation for bid submitted by the Government to the plaintiff.

On August 22, 1935, the plaintiff wrote to the Government that a sample blanket was being sent that day. (Pltff's. Ex. C)

On August 23, 1935, the Government sent the plaintiff the following telegram: "Relet Tuck Nap Not Tight Enough Stop Color Too Dark Stop Handle Too Stiff Stop Further Tests Being Made." (Pltff's. Ex. D)

On August 29, 1935, the Government telegraphed the defendant (Pltff's. Ex.F): "Retel Blanket Under In Weight Stop Other Tests Comma Except Handle Comma Shade And Finish Comma Satisfactory Stop Two Each Wool Samples Submitted By You And Inspector Satisfactory For Grade."

On August 29, 1935, the Government wrote a letter to the plaintiff (Pltff's. Ex. G) giving the result of the test made of the sample blanket on August 23.

The plaintiff, who had been in the woolen business practically all of his life, testified that it would take two or three minutes for a person properly equipped to inspect a blanket and that it would take only a few seconds to test the tuck nap.

On October 12, 1935, the plaintiff wrote to the Government (Pltff's. Ex. H) stating that the "U. S." stencil was defective and showed high and low places in the letters and that because of this "it is necessary to touch up by hand after stenciling."

On October 15, 1935, the Government wrote the plaintiff (Pltff's. Ex. I): "In answer to your letter of October 12th, you are informed that the supply of 'U.S.' Stamp Blocks is temporarily exhausted, but efforts are being made towards securing you a satisfactory block and same will be forwarded you if and when it becomes available at which time you will return the block you are now using to this Depot."

The plaintiff testified that a complete test of a blanket should be made within a half an hour; that because of the Government's delay in informing him by its letter of August 29, which was on a Friday, that he was unable to commence work until September 2, the day after Labor Day; that he was delayed by the Government nine days in commencing work. The Government claims

$1,124.55 as liquidated damages for that period.

On October 17, 1935, the Government wrote (Pltff's. Ex.J): "There is being forwarded to you under separate cover, via parcel post insured, one (1) 'U.S.' stamp block. Please return the stamp block you are now using promptly after receipt of the new block."

On October 25, 1935, the Government wrote (Pltff's. Ex.M):

"It has been found that only a slight deviation from the formula furnished for mixing the solution used for applying the 'U.S.' to blankets being furnished by you produces very unsatisfactory results.

"To eliminate this hazard, a new formula and method of procedure as shown on the attached sheet, have been prepared. The ingredients are easily procurable and their use should involve no additional expense.

"It must be understood however, that no additional cost shall ensue to the Government thereby.

"Please acknowledge receipt of this letter and inclosure."

The plaintiff testified that this new formula necessitated a change of mixture about every twenty minutes as against two or three times a day before; that the new formula did not do the job as well; that the second stencil would not stay "put" and caused the plaintiff considerable trouble because it was constantly changing and that the plaintiff had to touch up the blankets by hand and that this caused about ten days' delay in deliveries for which the Government charged liquidated damages against the plaintiff amounting to $478.98.

On October 11, 1936, the plaintiff wrote to the Government (Pltff's. Ex. N):

"It would be very much appreciated if you will send us the check as per our agreement of Oct. 10th, when the writer called at your Depot.

"As we are obliged to meet our obligations promptly, your cooperation in forwarding checks with the least possible delay is very necessary to the successful completion of this contract."

On October 15, 1935, the plaintiff wrote (Pltff's. Ex. O):

"We sent to you today the following telegram:

"'Kindly forward check by return mail to avoid stoppage of production. One third of contract in process or shipped.'"

On October 26, 1935, the plaintiff wrote (Pltff's. Ex. P):

"I am very sorry to learn that there again are some blankets with only 27 ends per inch. We are making every effort to correct this on future shipments. Meanwhile, there is nothing we can do except to ask you to make the deductions as light as possible.

"The liquidated damage clause is worrying me a good deal. Our capital is all tied up in this contract so that we must wait for a turnover before we can buy wool. The looms have been practically idle for over a week. We are getting 2000 lbs. of wool from the dye house this week.

"It is very unfortunate that I did not consider claims and rejects on my bid. We never had a Government contract before and were not familiar with the procedure. Besides a small profit for ourselves, our principal motive in bidding on this contract was to cooperate with the Government in putting people to work."

On December 10, 1935, the plaintiff wrote (Pltff's. Ex. Q):

"On Nov. 27th, 339 blankets, cartons 92 to 100, were accepted for payment. However, this check has not reached us to date. Will you kindly forward same by return mail.

"The blankets we refer to were shipped November 14th and 15th.

"We would also appreciate prompt examination and payments on all our shipments, as we must finish by Jan. 9th."

On December 16, 1935, the plaintiff wrote (Pltff's. Ex. R):

"It is very necessary that we receive a check for at least $3000.00 by next Wednesday, December 18th.

"If you have not examined a sufficient number of blankets for this amount, will you kindly remit on account."

On December 17, 1935, the Government wrote (Pltff's. Ex. S):

"Replying to your letter of December 16th, a voucher for approximately $2400 is being mailed you today. A check covering this will be mailed promptly after this is signed by you and received back at this Depot.

"For your information, no remittances are ever made on account. All your deliveries are being promptly inspected and the necessary papers to procure payment will be drawn up as promptly as possible."

On December 23, 1935, the plaintiff wrote (Pltff's. Ex. T):

"Enclosed herewith is copy of telegram sent you today.

"'Voucher of December 17th not received. Please forward $5000.—today. This will enable us to complete contract by January 9th.'

"In your letter dated December 17th you refer to a voucher for approximately $2400.—being mailed to us on that date.

"We hope to ship the last 2000 lbs. of wool to the dye house tomorrow."

On September 16, 1935, the plaintiff wrote (Pltff's. Ex. U):

"Due to unavoidable delays we regret to inform you that it will be ten days to two weeks before we can commence to ship in quantities."

"However, we will be on schedule before long."

On September 23, 1935, the plaintiff wrote (Pltff's. Ex. V): "Will you kindly extend time for first delivery 10 days to two weeks, as delays beyond our control is the reason for not being able to ship sooner. We are in a position to complete contract ahead of schedule, if desired."

The plaintiff testified that he went to the Quartermaster Depot in Philadelphia on October 10, 1935, because of the Government's complaints about holes in the blankets and on that visit he gave the Government the right to deduct 14½ cents per blanket not up to texture and that he was given to understand that he would receive prompt payment. He further testified that the Government's failure to pay within ten days of delivery caused him a loss of $2,369.89.

The plaintiff testified that he would not have bid on the contract if he had known that he could not get ten-day payments from the Government.

On August 8, 1935, the Government wrote (Govt's.Ex. 5) that the plaintiff's bid was accepted and that an award was made to him for furnishing and delivering at the Philadelphia Quartermaster Depot "10,000 . . . . . @ $4.895 each, Terms: Net". This letter also stated:

"Contract will be numbered W-669-qm-ECW-327, dated August 12, 1935, and will provide for deliveries as follows:

"5% within 36 days after date of this contract and 5% each 6 days thereafter,

until the quantity contracted for shall have been completed.

\* \* \* \* \* \*

"This is your authority to proceed with the work pending the execution of formal contract papers which will be forwarded to you for signature as soon as they can be prepared."

The plaintiff testified that he had ample capital to perform the contract only on a ten-day payment basis and that such payment was important to him.

Lieutenant Colonel Grice testified for the Government that the rejected blankets caused a delay in making payments to the plaintiff and that the Government made a one hundred percent inspection of the blankets furnished by the plaintiff; that in 1935 the Government required substandard deliveries.

Captain Albert E. Denis of the Quartermaster Corps testified that the plaintiff made deliveries of the blankets at intervals of a few days each between October 3, 1935, and January 28, 1936, and that the Government accepted 9,922 blankets and rejected 105; that the contract called for 500 blankets to be delivered on September 13, 1935, and that they were not delivered until October 9, 1935. He also furnished a schedule in regard to quantities, delays in deliveries, and unit price. He testified that the total amount of liquidated damages was $2,071.62.

He testified in regard to letters from the plaintiff to the Government in regard to 382 blankets rejected by the Government in which the napping was deficient and that the plaintiff offered them to the Government at $4.75, instead of the contract price of $4.895 each. The plaintiff's letter of October 10, 1935, contained this statement: "and as a further consideration we will hereby agree to waive all claims which might accrue against the Government by reason of your consideration and/or acceptance of this compromise offer."

He testified to further correspondence with the plaintiff in regard to blankets that did not meet specifications and of the plaintiff's offer and Government's acceptance of a lesser per unit price per blanket that did not meet specifications and the plaintiff was paid in full in accordance with the terms of the contract.

Colonel Vere Painter testified that he certified as to the causes of rejection of blankets under the contract; that 405 blankets were rejected because they were not sufficiently tuck napped; that 1,425 were rejected for failure to meet the requirements of the applicable specifications respecting warp texture; that the Government later accepted 1,724 nonspecification blankets at a reduction of 14½ cents each and 106 at a reduction of 24½ cents each and that these prices were agreed to by the contractor in preference to an outright rejection and a return of the blankets to the contractor's mill.

Lieutenant Colonel Eugene J. Heller of the Quartermaster Corps, testified that the plaintiff fixed the schedule of deliveries on his bid; that because of the volume of business in 1935 the Government could not guarantee ten-day payments; that the payment for the first two or three deliveries was delayed because of the nonacceptable blankets and that when blankets are defective, the processing of papers in regard to payments is delayed; that with the exception of the first two shipments the plaintiff received his payments from seven to fifteen days of the receipt of the blankets in Philadelphia.

He produced the "Findings" of L. O. Grice, Major, Q.M.C., Contracting Officer, dated April 20, 1937, which may be referred to on pages four and five of this decision.

He also produced the "Findings" of Major Vere Painter, Q.M.C., Contracting Officer, under date of August 17, 1937, (Govt's.Ex. 12) and the "Findings" of Major L. O. Grice, Q.M.C., Contracting Officer, under date of October 7, 1937, (Govt's.Ex. 13) which substantially held that the delays in payment were caused by the plaintiff's conduct.

The Government also introduced in evidence the following certificate of E. J. Heller, Major, Q.M.C., Contracting Officer, dated February 28, 1936 (Govt's. Ex. 14):

"I certify that in investigating the claim of The Bay Mill, East Greenwich, R.I., for reimbursement of the liquidated damages deducted for late deliveries on Contract W 669 qm-ECW 327, dated August 12, 1935, I have found the following facts:

"That the Government inspector reported a strike of six workers in the plant of the Florence Dye Works, beginning September 30, 1935; such strike continuing until October 12, 1935, with the plant running full during this period;

"That this strike had little or no effect upon the production of the contract; and that aside from this consideration, it is my opinion that the Florence Dye Works was a sub-contractor on this project and that delays arising from such source are not excusable under the conditions covered by Article 15 of the contract;

"That all other major causes of delay as set forth in the letter of claim are without merit and cannot be construed as unforeseeable causes beyond the control and without the fault or negligence of the contractor;

"That the claimant in letter of September 23, 1935, requested extension of ten days to two weeks on the first delivery due to delays beyond its control; and

"That in my opinion the contractor has not offered any tangible evidence of delay which would warrant the relief requested with respect to the liquidated damages assessed for late deliveries."

George Poors, a woolen inspector for the Government, attached to the Quartermaster Corps, testified that on August 27, 1935, he was sent to the plaintiff's mill by the Government; that it took about one-half minute to stencil a blanket with a good stencil and about one minute with the defective stencil; that the stenciling did not retard shipments; that the plaintiff complained to him several times of being held up in his deliveries because the Government did not make payments to him on time; that the machines in plaintiff's mill were stopped at the times because of lack of stock. He testified that the plaintiff's lack of capital was the cause of delays in deliveries of the blankets.

The certificate of the Acting Comptroller General of the United States, dated January 11, 1937 (Govt's.Ex. 15), a copy of which was addressed to the Bay Mill, under which name the plaintiff did business, stated as follows:

"I Certify there is due from the United States to the above-named claimant (s), payable from the appropriation (s) indicated, the sum of Twenty-six and 47/100 Dollars ($26.47) on account of remission of amounts deducted in making payment for blankets furnished the War Department, Philadelphia Quartermaster Depot, Philadelphia, Pennsylvania, under contract No. W-669-qm-ECW-327, dated August 12, 1935.

"025016 Emergency Relief, Emergency Conservation Work, War, Civilian Conservation Corps, 1935-March 31, 1937.

"(O.P. 25-35) FD 1623 P 1-3016-A 5016-57

"Of the total amount claimed, $2,537.30, the sum of $2,510.83, is herein disallowed for the reasons hereinafter stated. The contract provided for the delivery of 5% of the quantity ordered within 36 days after the date of the contract and 5% each six days thereafter until the quantity contracted for should be completed. Said contract also provided for the assessment of liquidated damages at the rate of $\frac{1}{6}$ of 1% of the price of each unit for each day's delay after the date or dates specified, with the stipulation that the contractor would not be charged with liquidated damages when the delay in delivery was due to unforeseeable causes beyond its control and without its fault or negligence, including but not restricted to acts of God, acts of the Government, etc., but not including delays caused by subcontractors. Article 4 (c) of the contract authorized acceptance of materials not conforming to specifications providing a proper reduction in price was made. The record shows that deliveries were delinquent and that liquidated damages were deducted in the amount of $2,098.09, and that an additional amount of $275.96 to cover blankets not conforming to specifications, was deducted according to agreement between the Government and the contractor. The contractor now requests that the total amount deducted be remitted on the ground that some of the major causes leading to late shipments were the dyer's difficulty in matching standard shade under all light conditions, inability to turn over available capital quickly enough to make up immediately for the first few deliveries, breakdown of main transmission at wool scouring plant, and a strike at the Florence Dye Works.

"The contract expressly provided that the contractor would not be entitled to remission of liquidated damages due to delays caused by sub-contractors, and since the Florence Dye Works was a subcontractor in this case, no possible delay caused by it could render a legal basis upon which the claim might be allowed. Insofar as the other facts of delay have been presented here, there is no showing that, as a matter of law, the delays may be classified as unforeseeable. Since the contract specifically provided for the assessment of liquidated damages in the event of delay in delivery and in view of the failure to deliver within the time specified, it appears that there is no legal basis upon which the

remittance of liquidated damages may be allowed. However, although liquidated damages were deducted in the amount of $2,098.09, the amount which should have been deducted was $2,071.62, indicating an overdeduction in the amount of $26.47, the amount herein allowed.

"Since the additional amount deducted, to cover blankets not conforming to specifications, was in accordance with an agreement between the contractor and the Government, there is no basis for the allowance of this amount."

■ The plaintiff contends that the contract was not executed until September 30, 1935, and the delivery dates were to begin from that date and not from August 12, 1935, the date which the contract bears. In support of this contention he cites R.S. § 3744, June 15, 1917, c. 29, § 1, 40 Stat. 198, 41 U.S.C.A. § 16, which reads as follows:

"Except as otherwise provided by law, it shall be the duty of the Secretary of War, of the Secretary of the Navy, and of the Secretary of the Interior, to cause and require every contract made by them severally on behalf of the Government, or by their officers under them appointed to make such contracts, to be reduced to writing, and signed by the contracting parties with their names at the end thereof; a copy of which shall be filed by the officer making and signing the contract in the returns office of the Department of the Interior, as soon after the contract is made as possible, and within thirty days, together with all bids, offers, and proposals to him made by persons to obtain the same, and with a copy of any advertisement he may have published inviting bids, offers, or proposals for the same. All the copies and papers in relation to each contract shall be attached together by a ribbon and seal, and marked by numbers in regular order, according to the number of papers composing the whole return: Provided, That the Secretary of War or the Secretary of the Navy may extend the time for filing such contracts in the returns office of the Department of the Interior to ninety days whenever in their opinion it would be to the interest of the United States to follow such a course."

The court does not agree to this contention. The contract was reduced to writing and signed by the contracting parties with their names at the end thereof and was properly filed in accordance with the provisions of the statute.

■ The court finds that the plaintiff has not established by a fair preponderance of the evidence that the delays in deliveries of the blankets were caused by the acts of the Government but were due largely because of the plaintiff's lack of working capital and that the Government had the right to claim the liquidated damages as provided for in Article 15 of the contract.

In the Standard Form of Bid on Sheet No. 4 (Govt's.Ex. 9) under the heading "Proposed Deliveries" there appears the following: "First delivery of 5% per cent in 36 days from receipt of notification of award. Subsequent deliveries of 5% per cent each 6 days after first delivery." 5%, 36, 5% and 6 as they appear immediately above were written by the plaintiff on the bid which he submitted to the Government.

These provisions in regard to amount and time were incorporated into the formal contract which was subsequently signed by the plaintiff and appear in Article 1. (Pltff's.Ex. A.)

The delays in payment to the plaintiff were caused also by the plaintiff's failure to conform to the specifications of the contract. The Government found it necessary to make a 100% inspection of the blankets with the result that about 18% were rejected by the Government. The processing of the papers for payment under these circumstances necessarily caused delays in payment to the plaintiff and also financial embarrassment to him. This was evidenced by his trips to Philadelphia and his correspondence with the Government. In his letter of October 15, 1935 (Pltff's.Ex. O), he wrote: "Kindly forward check by return mail to avoid stoppage of production", and in his letter of October 26, 1935, (Pltff's.Ex. P) he wrote in part:

"The liquidated damage clause is worrying me a good deal. Our capital is all tied up in this contract so that we must wait for a turnover before we can buy wool."

The Government had the right to reject the non-specification blankets. However, it accepted the plaintiff's offer to buy such blankets at a reduced price, thereby saving the plaintiff from sustaining a heavy loss.

The plaintiff has not established by a preponderance of the evidence that the Government did anything that prevented him from making the deliveries of the blankets contracted for within the specified

times and which relieved him from the reasonable liquidated damages which he agreed to pay.

In the case of Sun Printing & Publishing Ass'n v. Moore, 183 U.S. 642, 669, 22 S.Ct. 240, 251, 46 L.Ed. 366, the court said:

"A court of law possesses no dispensing powers; it cannot inquire whether the parties have acted wisely or rashly, in respect to any stipulation they may have thought proper to introduce into their agreements. If they are competent to contract within the prudential rules the law has fixed as to parties, and there has been no fraud, circumvention, or illegality in the case, the court is bound to enforce the agreement. Men may enter into improvident contracts where the advantage is knowingly and strikingly against them; they may also expend their property upon idle or worthless objects, or give it away if they please without an equivalent, in spite of the powers or interference of the .court; and it is difficult to see why they may not fix for themselves by agreement in advance, a measure of compensation, however extravagant it may be, for a violation of their covenant (they surely may after it has accrued), without the intervention of a court or jury. Can it be an exception to their power to bind themselves by lawful contract? We suppose not; and regarding the intent of the parties, it is not to be doubted but that the sum of $3,000 was fixed upon by them 'mutually and expressly,' as they say, 'as the measure of damages for the violation of the covenant, or any of its terms or conditions.' If it be said that the measure is a hard one, it may be replied that the defendants should not have stipulated for it; or, having been thus indiscreet, they should have sought the only exemption, which was still within their power; namely, the faithful fulfilment of their agreement."

▇ The plaintiff testified that when he wrote the word "net" on his bid in the manner that he did, he understood it meant that the Government was to pay him ten days after he made deliveries. In the formal contract the word "net" does not appear on Sheet No. 1 of the Standard Government Form of Bid which is attached to and made part of the Standard Government Form of Contract (Pltff's. Ex. A). The word "net" appears in paragraph 10 on Sheet No. 3 of the Schedule of Supplies which is part of the contract and is used with reference to a discount that will be allowed for a prompt payment.

It would seem, under these circumstances, that no discount was to be allowed for payment in ten calendar days. The parties were bound by Article 8 in regard to payments.

In the case of St. John v. Erie Railway Company, 22 Wall. 136, 148, 89 U.S. 136, 148, 22 L.Ed. 743, the court said: "The lexical definition of net is 'clear of all charges and deductions,—Webster. 'That which remains after the deduction of all charges or outlay, as net profit.'—Worcester. The popular acceptation of the term is the same."

Funk & Wagnalls New Standard Dictionary of the English Language, 1934 Edition, defines "net" as follows: "Not subject to any discount or deduction as a net price."

▇ Article 12, supra, provides in part that all disputes concerning questions of fact arising under the contract shall be decided by the contracting officer or his duly authorized representative, subject to written appeal by the contractor within thirty days to the head of the department concerned, whose decision shall be final and conclusive upon the parties hereto as to such questions of fact. There is no ambiguity in the meaning of this article.

The decisions of the contracting officers have been quoted above. No testimony was offered by the plaintiff to warrant the court in declaring that the decisions of the contracting officers are tainted by fraud or bad faith.

In the case of Penn Bridge Co. v. United States, 59 Ct.Cl. 892, 897, the court said:

"It has repeatedly been held by highest authority that 'it is competent for parties to a contract, of the nature of the present one, to make it a term of the contract that the decision of an engineer or other officer of all or specified matters of dispute that may arise during the execution of the work shall be final and conclusive, and that in the absence of fraud or of mistake so gross as to necessarily imply bad faith such decision will not be subjected to the revisory powers of the courts.' The language quoted is from the Gleason case [United States v. Gleason], 175 U.S. 588, at [page] 602 [20 S.Ct. 228, 44 L.Ed. 284]. The same principle is declared by the Supreme Court and this court in many other cases both antecedent and subsequent to that case. Among them see McBride Electric Co. v. United States, 51 Ct.Cl. 448, 456; Pacific Hardware [& Steel] Co. v. United States, 49 Ct.Cl. 327; McLaughlin & Co. v. United

States, 37 Ct.Cl. 150, 188; Barlow et al. v. United States, 35 Ct.Cl. 514, 546; Kennedy v. United States, 24 Ct.Cl. 122, 139; Merrill-Ruckgaber Co. v. United States, 241 U.S. 387, 393 [36 S.Ct. 662, 60 L.Ed. 1058]; Ripley v. United States, 223 U.S. 695, 704 [750, 32 S.Ct. 352, 56 L.Ed. 614]; United States v. Barlow, 184 U.S. 123, 133 [22 S. Ct. 468, 46 L.Ed. 463]; United States v. Gleason, 175 U.S. 588, 602, 607 [20 S.Ct. 228, 44 L.Ed. 284]; Chicago, Santa Fe & California R. Co. v. Price, 138 U.S. 185, 193 [18 S.Ct. 290, 34 L.Ed. 917]; Martinsburg & Potomac R. R. Co. v. March, 114 U.S. 549, 550 [5 S.Ct. 1035, 29 L.Ed. 255]; Sweeney v. United States, 109 U.S. 618, 620 [3 S.Ct. 344, 27 L.Ed. 1053]; Kihlberg v. United States, 97 U.S. 398, 401 [24 L.Ed. 1106]. More recent cases in this court relied on by plaintiff are Yale & Towne Mfg. Co. [v. United States], 58 Ct.Cl. 633, and National Contract Co. [v. United States, 59 Ct.Cl.] 441. In the first of these cases we said:

" 'Provisions in Government contracts reposing in some designated official the right to determine certain questions and making his determination thereof conclusive are of frequent occurrence. Such provisions are inserted largely for the protection of the Government, and the cases in which such a determination by the designated official has been upheld by the courts have been largely cases in which the rule has been invoked in favor of the United States and against the plaintiff, but the rule is none the less effective if perchance it occasionally may operate the other way.' "

It is ordered that judgment be entered for the defendant. This judgment is without prejudice to the right of the plaintiff to claim the amount of $26.47 which the Government admits is due the plaintiff.